UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARITZA MARQUEZ and
YANCY MARQUEZ,

                                     Plaintiffs,

                  – against –

ANTHONY J. ANNUCCI, Acting Commissioner of
the New York State Department of Corrections and
Community Supervision, *in his official capacity only*;
WILLIAM HOGAN, Regional Director of New York
State Department of Corrections and Community
Supervision; JOSEPH LIMA, Area Supervisor for the
New York State Division of Parole; Bureau Chief
LEWIS SQUILLACIOTI; Senior Parole Officer M.
MEDINA; Parole Officer ROSA NUNEZ; Senior
Parole Officer R. HAMILTON; Senior Parole Officer
KEVIN UZZELL; Senior Parole Officer NEELEY;
Bureau Chief MARK PARKER; Parole Officer
ALEXANDRA MANDERSON; Parole Officer
BRIAN FULLER; Parole Officer MERCEDES; Parole
Officer JOHN DOE; Parole Officer RODRIGUEZ;
Parole Officer McEWEN; Parole Officer LOFTON;
Senior Parole Officer HAMILTON; Parole Officer
LINDSY OSOUNA; Senior Parole Officer J.
KENNEDY; and, Parole Officer A. CONYERS,

                                     Defendants.

---

20 Civ. _____ (___)

**COMPLAINT**

Plaintiffs Maritza and Yancy Marquez, by their attorneys, allege as follows:

## Preliminary Statement

1. Yancy and Maritza Marquez are a married couple who, despite loving each other dearly and having chosen to mutually commit through marriage, are barred from having any contact with one another. This prohibition was put in place and enforced by Defendants as part of Plaintiffs' respective conditions of post-release supervision ("PRS"), which resulted from their convictions for unrelated sex offenses a decade ago. Unless Defendants lift their prohibition, Plaintiffs will not be able to see or communicate with each other until 2034, when Mrs. Marquez's term of PRS expires. At that point, Mr. Marquez will be 47 years old and Mrs. Marquez will be 44.

2. Because Mr. and Mrs. Marquez face imprisonment if they see or communicate with each other in any way, they have been forced to effectively terminate their relationship and are now husband and wife on paper only.

3. Defendants issued this arbitrary prohibition even though Plaintiffs' convictions have nothing to do with domestic violence and neither Mr. nor Mrs. Marquez has any such history; even though Plaintiffs have attended sex-offender treatment and various other programs aimed to reduce the risk of recidivism (indeed, they met while attending programs at The Fortune Society); even though both have worked to establish themselves as positive members of society; and despite the wealth of empirical research establishing that a supportive relationship vastly reduces the risk of recidivism and helps ensure successful reentry.

4. In fact, an expert in the assessment of the recidivism risks of sex offenders recently evaluated Mr. and Mrs. Marquez and concluded that they present no risk to each other and that their association does not increase—but rather reduces—the risk of recidivism.

1

5.      Defendants have never justified their restrictions to Mr. or Mrs. Marquez other than to verbally state that Plaintiffs are sex offenders, convicted felons, and/or parolees, as though such designations are justification enough for a blanket ban on any interaction between husband and wife.

6.      Defendants' enforcement of this arbitrary prohibition has been erratic, sowing confusion and interfering with the couple's ability to plan for the future and to establish stable lives.  It has also been extremely demoralizing and the cause of immeasurable emotional harm to the couple.

7.      Accordingly, Defendants, acting under color of state law, infringed and continue to infringe upon Plaintiffs' fundamental constitutional rights without any compelling—or even rational—justification.

8.      Plaintiffs, therefore, seek to permanently enjoin Defendants from imposing this condition on them; seek declaratory judgment that such arbitrary restriction of their fundamental rights is unconstitutional; and, seek appropriate monetary relief.

## JURISDICTION AND VENUE

9.      This case is brought pursuant to 42 U.S.C. § 1983.  The case arises under the Constitution and the laws of the United States and presents a federal question within the Court's jurisdiction under Article III of the Constitution and 28 U.S.C. §§ 1331 & 1343.

10.      The Court has the authority to provide appropriate injunctive and declaratory relief pursuant to 28 U.S.C. §§ 2201 & 2202.  Plaintiffs seek monetary damages, attorneys' fees, and costs under 42 U.S.C. §§ 1983 & 1988.

11.      Venue in the Southern District of New York is proper under 28 U.S.C. § 1391(b) as a substantial part of the acts giving rise to Plaintiffs' claims occurred in this District, specifically in Manhattan and the Bronx.

## PARTIES[1]

12.     Plaintiff Maritza Marquez is under PRS and resides in Queens, New York.  She is legally married to Yancy Marquez.  Prior to her marriage, she was known as Maritza Wallace.

13.     Plaintiff Yancy Marquez is under PRS and has resided in New York and Bronx counties.  He is legally married to Maritza Marquez.

14.     Defendant Anthony J. Annucci is the Acting Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS").

15.     Defendant William Hogan is a former Regional Director of DOCCS, whose responsibility in or around 2015 included oversight of the Manhattan offices of the New York State Division of Parole ("DOP"), a Division of DOCCS.

16.     Defendant Joseph Lima is a former Area Supervisor for DOCCS's parole office in Manhattan.  Upon information and belief, he was involved in Mr. Marquez's supervision at times when Mr. Marquez resided in Manhattan.

17.     Defendant Lewis Squillacioti is a former Bureau Chief of DOCCS's parole office in Manhattan.  Upon information and belief, he was involved in Mr. Marquez's supervision at times when Mr. Marquez resided in Manhattan.

18.     Defendant M. Medina is a Senior Parole Officer for DOCCS in Manhattan.  Officer Medina was involved in supervising Mr. Marquez from in or around August 2014 to in or around May 2016.  Defendant Medina was transferred to DOCCS's parole office in the Bronx in or around 2017 and was involved in supervising Mr. Marquez there from in or around November 2017 to in or around October 2018.

---

[1]     The names of Defendants are based upon information and belief. Where it was not possible to ascertain their first names, they are referred to only by their last names. Some names may be misspelled.

19.     Defendant Rosa Nunez is a Parole Officer for DOCCS in Manhattan.  She supervised Mr. Marquez from in or around August 2014 to in or around May 2016.

20.     Defendant R. Hamilton is a Senior Parole Officer for DOCCS in Manhattan.  He was involved in supervising Mr. Marquez from in or around August 2014 to in or around May 2016, and again from in or around March 2017 to in or around August 2017.

21.     Defendant Mercedes is a Parole Officer for DOCCS in Manhattan.  Officer Mercedes was involved in supervising Mr. Marquez from in or around February 2017 to in or around August 2017.

22.     Defendant John Doe, whose actual identity is unknown to Plaintiffs, is a Parole Officer for DOCCS.  On or around March 15, 2017, he accompanied Mr. Marquez as he was transported to a residence in Bronx County from the Fishkill Residential Treatment Facility.

23.     Defendant Rodriguez is a Parole Officer for DOCCS in Manhattan.  Officer Rodriguez was involved in supervising Mr. Marquez from in or around March 2017 to in or around August 2017.

24.     Defendant McEwen is a Parole Officer for DOCCS in the Bronx.  She was assigned to supervise Mr. Marquez from around August 2017 to around November 2017.

25.     Defendant Lofton is a Parole Officer for DOCCS in the Bronx.  He was assigned to supervise Mr. Marquez from in or around November 2017 to in or around October 2018.

26.     Defendant Hamilton is a Senior Parole Officer for DOCCS in the Bronx.  He was involved in supervising Mr. Marquez from around November 2017 to around October 2018.

27.     Defendant J. Kennedy is a Senior Parole Officer for DOCCS in Manhattan.  He has been involved in supervising Mr. Marquez from around October 2018 to March 2019.

28.     Defendant A. Conyers is a Parole Officer for DOCCS in Manhattan.  He was assigned to supervise Mr. Marquez from in or around October 2018 to March 2019.

29.     Defendant Kevin Uzzell was a Senior Parole Officer in Queens.  He was involved in supervising Mrs. Marquez from in or around May 2015 to 2016.

30.     Defendant Neeley is a Senior Parole Officer in Queens.  He has been involved in supervising Mrs. Marquez from in or around May 2015 to present.

31.     Defendant Mark Parker is a Bureau Chief of the DOCCS's parole office in Queens.  He has been involved in Mrs. Marquez's supervision from around July 2015 to present.

32.     Defendant Alexandra Manderson is a Parole Officer for DOCCS in Queens.  She was supervising Mrs. Marquez in or around July 2015.

33.     Defendant Brian Fuller is a Parole Officer for DOCCS in Queens.  He supervised Mrs. Marquez from in or around August 2015 to in or around February 2017.[2]

34.     Defendant Lindsy Osouna is a Parole Officer for DOCCS in Queens.  She was assigned to supervise Mrs. Marquez in or around February 2018 to in or around March 2019.

35.     The Defendants — with the exception of Defendant Annucci — are each sued in their individual and official capacities.  Defendant Annucci is sued only in his official capacity.

## FACTS[3]

### *Background*

36.     Yancy Marquez was born in 1986.  He married Maritza Marquez in September 2015.  This union represents his first and only marriage.  He has no children and has lived in

---

[2]     Between February 2017 and February 2018, Mrs. Marquez was supervised by Aiesha Quick, who is not named as a defendant in this action.

[3]     The following allegations are based upon Plaintiffs' recollections or upon information and belief based on documents reviewed in preparation for this filing.

New York his entire life. From the age of eight to 12, Mr. Marquez was sexually abused by his older sister, who forced him to perform oral sex on her on a regular basis. Mr. Marquez was also physically abused by his mother, who regularly used illicit substances throughout his childhood.

37.     Maritza Marquez, formerly Maritza Wallace, was born in 1989. Her marriage to Mr. Marquez is also her first. She has one child, a teenage daughter who lives in Jamaica with Mrs. Marquez's brother. This child is the product of a rape that Mrs. Marquez suffered in her native Jamaica when she was approximately 15 years old. Mrs. Marquez was also sexually abused by other members of her community, including a high-ranking church official, from ages 5 to 13. After the birth of her child, Mrs. Marquez's family sent her to live with her father in the United States, where she was raped by two different men. She nevertheless attended school and worked several jobs to support herself and help her father pay for a loan he had taken out against the mortgage for his apartment.

### Plaintiff Yancy Marquez is Convicted of a Sex Offense

38.     On October 3, 2008, Mr. Marquez was convicted, upon a guilty plea, of criminal sexual act in the first degree, N.Y. Penal Law § 130.50(3), the top charge in the indictment against him. The conviction is his first and only sex offense, and indeed, his first and only criminal conviction.[4] The offense stemmed from an incident in which it was alleged that sometime between June 15th and 30th, 2007, Mr. Marquez, then 20, engaged in anal sexual conduct with an eight-year-old male cousin. Mr. Marquez was sentenced to five years in prison followed by 10 years of PRS.

---

[4]      Mr. Marquez's prior history consists of a 2004 adjudication as a youthful offender after pleading guilty to petit larceny, N.Y. Penal Law § 155.25, and a 2001 adjudication as a juvenile delinquent for fourth-degree conspiracy, N.Y. Penal Law § 105.10.

### *Plaintiff Maritza Marquez is Convicted of a Sex Offense*

39.     On July 15, 2010, Mrs. Marquez, then Ms. Wallace, was convicted, upon a guilty plea, of criminal sexual act in the first degree, N.Y. Penal Law § 130.50(2), and endangering the welfare of a vulnerable elderly person in the second degree, N.Y. Penal Law § 260.32(4).  The conviction was her first and only sex offense, and indeed, her first and only criminal conviction.[5] It stemmed from an incident in which it was alleged that on July 15, 2009, when she was approximately 20 years old, Ms. Wallace placed her vagina on the mouth of a 78-year-old woman and kissed her face and body over her clothing.  Mrs. Marquez was the woman's home attendant.  Mrs. Marquez took full responsibility for her conduct.

40.     Denying the prosecution's request for a 10-year prison sentence, the Queens County Supreme Court sentenced her to five years' incarceration followed by 20 years of PRS.

### *Yancy Marquez's Commitment to Bettering Himself While Incarcerated*

41.     In prison, Mr. Marquez worked to better himself.  He successfully completed the Alcohol and Substance Abuse Treatment program, where counselors described Mr. Marquez as a "positive role model" who was successfully addressing many personal issues that had resulted in negative consequences.

42.     Similarly, Mr. Marquez took seriously the Sex Offender Counseling and Treatment Program ("SOCTP"), where he received high marks for motivation and showed insight into, and acceptance of responsibility for, his offense.[6]

---

[5]     On October 14, 2009, Mrs. Marquez was convicted of disorderly conduct, N.Y. Penal Law § 240.20, a non-criminal violation. She has no other arrests, convictions, or adjudications.

[6]     While Mr. Marquez was not able complete the program while in prison, he successfully completed a proscribed term of sex offender treatment once he was released into the community in 2013.

### *Maritza Marquez's Commitment to Bettering Herself While Incarcerated*

43.     Mrs. Marquez also worked hard to rehabilitate herself during her incarceration. She had the opportunity to address, for the first time in her life, the impact of the sexual abuse she suffered as a child.  She took it upon herself to participate in Sisters Healing Old Wounds, a support group for victims of abuse.  Mrs. Marquez recounts that she found the experience "eye-opening."

44.     Mrs. Marquez successfully completed Aggression Replacement Training.  She showed high motivation and insight in the sex offender treatment program, which she similarly successfully completed.

45.     Further, Mrs. Marquez also successfully participated in an "Alternatives to Incarceration" program with STEPS to End Family Violence, a nonprofit agency dedicated to providing counseling service to survivors of domestic violence and sexual abuse.  Her counselors noted that Mrs. Marquez was motivated to address the trauma of her past abuse.

### *Yancy Marquez Continues His Rehabilitative Efforts in the Community*

46.     On or around October 15, 2012, Mr. Marquez was released from prison and placed on PRS in the community.  Prior to his release, Mr. Marquez was classified by New York as a level three sex offender.[7]  Mr. Marquez will be on PRS until 2022.

47.     Upon his release, Mr. Marquez lived in Brooklyn, then in Queens, and reported to his parole officer on a weekly basis.  As required by his parole, Mr. Marquez attended and successfully completed sex offender treatment, drug and alcohol treatment, and anger

---

[7]     This determination was made pursuant to New York's Sex Offender Registration Act ("SORA"), codified as N.Y. Corr. Law § 168-a *et seq*. The original determination, made by the Kings County Supreme Court, was reversed two years later on appeal on procedural due process grounds, and the matter was remitted for a new risk level assessment hearing, which took place in May 2015. The Kings County Supreme Court again classified him a level three sex offender at that hearing.

management programs at the New York Center for Addiction Treatment Services, or NYCATS, now known as RevCore Recovery Center.

48.      Through Project Renewal, a non-profit organization, Mr. Marquez completed a job training program in the culinary arts and obtained employment cooking meals for homeless shelters.  At first, Mr. Marquez worked at the Third Street Men's Shelter in Manhattan cooking breakfast, lunch, and dinner for the residents there before transitioning to a more intensive role preparing meals for 22 New York City Department of Homeless Services ("DHS") shelters out of a central location.  *See generally* Declaration of Tomoeh Murakami Tse ("TMT Decl.") ¶3, Exh. A (Records of Post-Conviction Accomplishments and Mental Health Diagnosis).

49.      Mr. Marquez also reported every 90 days to the New York Police Department's Sex Offender Monitoring Unit ("SOMU") in Manhattan to verify his home address, as required by New York Correction Law § 168-f(3).

50.      In or around summer 2014, following Mr. Marquez's move to Manhattan, oversight of his PRS was transferred from DOCCS's Division of Parole in Queens to the Manhattan VI Area Office.  Defendant Rosa Nunez was assigned as his parole officer.  Upon information and belief, Defendants M. Medina and R. Hamilton, Senior Parole Officers, and Joseph Lima, the Area Office Supervisor at the time, were also involved in overseeing Mr. Marquez's PRS in Manhattan.

51.      Around this time, Mr. Marquez relapsed and used cocaine.  He self-reported, informing Defendant Nunez, and requested to go back into a drug treatment program.

52.      On or around August 11, 2014, Mr. Marquez also missed a SORA-mandated reporting appointment at SOMU.  As a result, he was arrested on or around October 14, 2014. Failure to verify in person is a felony and may also serve as the basis for revocation of parole (or

PRS) under New York Correction Law § 168-t.  Mr. Marquez was arraigned and released on his

own recognizance.  *See* TMT Decl., Exh. C (PRS Violation Documents for Y. Marquez).

53.     Upon learning of the arrest, Defendant Nunez contacted the assistant district

attorney assigned to Mr. Marquez's failure-to-report case.  The assistant district attorney

conveyed that she was considering dismissing the charge so that Mr. Marquez could continue his

rehabilitation in the community.  Because Mr. Marquez "ha[d] a stable residence," and

"continue[d] to attend his mandated treatment programs as required," thus "continu[ing] to be

amenable to parole supervision," Defendants Nunez and Medina recommended that Mr.

Marquez continue on PRS and not be re-incarcerated.  TMT Decl., Exh. C at 4.

54.     Mr. Marquez has not missed a required reporting date since August 2014.

55.     He has continued, however, to struggle with drug addiction.  In or around late

2014, Mr. Marquez tested positive for cocaine.  In or around February 2015, he enrolled in a 28-

day inpatient treatment program.[8]

56.     In or around March 2015, following his successful completion of the inpatient

program, Mr. Marquez enrolled in a job training program at The Fortune Society in Long Island

City.  It was there that he met Mrs. Marquez, who would become a positive force in his life and

help him move forward with his rehabilitation and reentry into society.

57.     In or around June 2015, Mr. Marquez obtained a position working as a line-cook

at an Applebee's Neighborhood Bar & Grill Restaurant.

---

[8]     In late 2018, Mr. Marquez again tested positive for illicit substances and enrolled in another
program, which he completed.

### *Maritza Marquez Continues Her Rehabilitative Efforts in the Community*

58.    Mrs. Marquez was released to PRS on or around December 13, 2013.  Prior to her release, she was classified by New York as a level three sex offender.[9]  Mrs. Marquez is scheduled to be on PRS until 2034—or 14 more years.

59.    Mrs. Marquez continued her self-improvement and rehabilitation upon her release from prison.  She reported weekly as required to her parole officer — first in DOCCS's parole office in Brooklyn, and, following her move to Queens around mid-2014, to the Queens II Area Office, located at 92-36 Merrick Boulevard.

60.    Mrs. Marquez attended a variety of programs — both those mandated by parole, including anger management and after care for sex offender treatment at Queens Center for Change in Long Island City, as well as those she sought out on her own.  The latter included therapy for anxiety and post-traumatic stress disorder at The Fortune Society, and a reentry program with Queens Justice Corps, operated by the Center for Alternative Sentencing & Employment Services Inc.

61.    Mrs. Marquez distinguished herself at Queens Justice Corps and became a peer mentor to other program participants.  She successfully completed the year-long program in only six months.  *See* TMT Decl., Exh. B (Records of Post-Conviction Accomplishments and Mental Health Diagnosis for M. Marquez), at 5 (noting her "exceptional[]" performance in the program, including that she was "[a]lways punctual and extremely focused," "displayed excellent leadership qualities" and possessed "self-determination and ability to persevere").

62.    Mrs. Marquez also excelled in a six-month internship with the Office of New York City Councilman Daneek Miller, who represents District 27 in Queens.  According to

---

[9]    Her SORA determination was made at a hearing held in Queens County.

Councilman Miller, Mrs. Marquez is a "bright, conscientious young lady" whom he would "wholeheartedly recommend" "to any organization."  TMT Decl., Exh. B at 6.

63.     Further, in or around February 2015, Mrs. Marquez obtained a job providing client services to residents in homeless shelters operated by DHS.  She excelled in this position as well, but was laid off later in the year when the DHS contractor she was working for was not selected in the contract bidding process to continue providing services at that location—*i.e.*, funding was lost for her position.  She valued her time working at the shelters and enjoyed giving back to the community.

64.     In or around December 2015, Mrs. Marquez obtained employment as a server/hostess at a Buffalo Wild Wings restaurant in Flushing, Queens.  She remains employed there at present.  Her managers consider her to be a super star employee and the employee they go to when they need something done quickly and correctly.  Employment at Buffalo Wild Wings has enabled Mrs. Marquez to provide approximately $100 per week in financial support for her daughter, who currently resides with Mrs. Marquez's brother.  In addition, every 90 days, Mrs. Marquez sends several hundred dollars to cover her daughter's school fees.

### The Relationship Between Mr. and Mrs. Marquez Flourishes at The Fortune Society

65.     In early 2014, Mrs. Marquez completed a job training program at The Fortune Society.  She enrolled on her own, not at the request of parole, to aid in her rehabilitation efforts. Later that year, she began receiving mental health treatment there, for anxiety and post-traumatic stress disorder relating to the sexual molestation she suffered as a child.

66.     Mr. Marquez, meanwhile, had begun attending his job training program at Fortune in or around March 2015.

67.     It was in this therapeutic environment at Fortune that Mr. and Mrs. Marquez met. They encouraged each other as each faced the challenges of reentering society as a person with a felony conviction, in particular for a sex offense, with all of the attendant restrictions and stigma. Over time, their feelings for each other grew.

### DOCCS Prohibits Mr. and Mrs. Marquez from Having Contact with Each Other

68.     In or around July 2015, Mr. and Mrs. Marquez approached their respective parole officers, in Manhattan and in Queens, and informed them of their desire to pursue a serious relationship.  Upon information and belief, DOCCS requires individuals on supervised release for sex offenses to inform their parole officers of any romantic relationship; the supervisees must bring their partners to the parole office and inform them of their sex offenses in front of their parole officers.

69.     In keeping with those requirements, Mrs. Marquez relayed her desire to pursue a relationship with Mr. Marquez to her parole officer, Defendant Alexandra Manderson, during an office visit on or around July 15, 2015.[10]  Officer Manderson called her supervisor, Defendant Kevin Uzzell.  Supervising Parole Officer Uzzell told Mrs. Marquez that he did not have a problem with her seeing Mr. Marquez, but that Mr. Marquez would have to come in to the office so that Defendant Uzzell could meet him.

70.     However, Mr. Marquez's parole officer, Defendant Rosa Nunez, had a different response when he informed her of the relationship during his regularly scheduled parole office visit in Manhattan on or around August 6, 2015.  Officer Nunez ordered Mr. Marquez to "not

---

[10]     In addition, Mrs. Marquez had previously informed Defendant Manderson, on or around June 17, 2015, that she had "met someone she is interested in," had already told the person—Mr. Marquez—about her sex crime and inquired about bringing him to the parole office to meet with her supervising parole officers as required under her conditions of release.

have any contact or [] associate in any way with Maritza Wallace, NYSID #9075892J," and required Mr. Marquez to sign a document to such effect.  *See* TMT Decl., Exh. C at 6. Defendant Medina was also present during this interaction.  Upon information and belief, Defendant R. Hamilton was also involved in the decision.

71.     When Officers Nunez and Medina issued the "stay-away" condition, Mr. Marquez informed them that Mrs. Marquez was important to him, and that someday he hoped she would be his wife.  Neither Officer Nunez nor Officer Medina explained why this condition was imposed; nor did they indicate if it would or could ever be lifted.

72.     Then, when Mrs. Marquez reported to the Queens parole office on or around August 12, 2015, she discovered that Defendants Manderson and Uzzell had changed course: they ordered Mrs. Marquez to stay away from Mr. Marquez.  Defendants Manderson and Uzzell characterized this condition as "no contact pending investigation."[11]  Defendants required Mrs. Marquez to sign a document that read, "I will have no contact of any sort with Yancy Marquez. This includes telephone, text, and third party."  *See* TMT Decl., Exh. D1 at 15 (PRS Violation Documents for M. Marquez).  Defendant Bureau Chief Parker was also present for this meeting.

73.     About three weeks later, Mrs. Marquez was assigned a new parole officer, Defendant Brian Fuller.  Officer Fuller similarly ordered her to stay away from Mr. Marquez and required her to sign another document to that effect.  Mrs. Marquez asked Officer Fuller how

---

[11]     Upon information and belief, Defendants Manderson and/or Uzzell communicated with their counterparts in the Manhattan office where Mr. Marquez was supervised, and learned that another supervisee there had requested that his parole be transferred to another office on the ground that Mr. Marquez was a gang member. Upon information and belief, Defendants Manderson and Uzzell, in stating that Mrs. Marquez's special condition was "pending investigation," were referring to the investigation into this transfer request and corresponding allegation of Mr. Marquez's gang membership.

While the outcome of this investigation is unknown, Mr. Marquez is not, and has never been, in a gang. Upon information and belief, the allegation was a pretext, initiated by another resident at Mr. Marquez's shelter, designed to disrupt Mr. Marquez's relationship with Mrs. Marquez so that the instigator could make his own amorous overtures towards her. At the time, Mrs. Marquez was working as a client services specialist at the shelter where both the instigator and Mr. Marquez were residing.

long the no-contact provision would remain in effect, and he replied, in essence, "It's above my pay grade, kid."

74.     Mr. and Mrs. Marquez were very disappointed.  Although they maintained hope that the prohibition was not permanent, no one from DOCCS ever communicated to them a procedure or timeline for modifying or removing the prohibition.

### Mr. and Mrs. Marquez Marry and Inform Their Respective Parole Officers of the Union

75.     Neither Mr. nor Mrs. Marquez wanted to risk losing the other.  With no end to the prohibition in sight, they decided to marry.  They hoped that formally expressing their love for each other might convince their parole officers of the seriousness of their relationship and their commitment to support one another.

76.     On or around September 16, 2015, Mr. and Mrs. Marquez were married at City Hall in Manhattan.  *See* TMT Decl., Exh. D3 at 12 (Marriage License).

77.     In or around January 2016, Mr. and Mrs. Marquez, hoping to achieve more than a paper-marriage and understanding that they could not keep their marriage secret, decided to inform their respective parole officers of the union.

### Mr. and Mrs. Marquez Are Taken Into Custody

78.     On or around January 28, 2016, Mrs. Marquez reported to the Queens parole office and informed Defendant Fuller that she and Mr. Marquez had married.  Defendant Fuller called Defendants Uzzell and Parker and discussed the matter with them.  Mrs. Marquez was sent home that day and told to return in a week.  Upon information and belief, Fuller then contacted Mr. Marquez's parole officer in Manhattan.

79.     On or around January 31, 2016, when questioned about their relationship, Mr. Marquez informed Defendant Nunez that he had married Mrs. Marquez. Nunez told Mr.

15

Marquez that she was disappointed he had violated the no-contact provision, and that she would be informing her supervisor of the matter.  Mr. Marquez was arrested when he next reported to the parole office on or around February 5, 2016.

80.     Mrs. Marquez, meanwhile, was arrested at her next visit to the parole office, on or around February 4, 2016.

81.     Mr. Marquez was charged with violating Rule 13, the special condition imposed in August 2015 preventing him from contacting Mrs. Marquez.  Specifically, it was alleged that "[o]n 9/16/15, the subject had contact with Maritza Wallace when he married her which [*sic*] contrary to the special conditions he signed with PO R. Nunez on 8/6/15."  TMT Decl., Exh. C at 2.  It was further alleged that Mr. Marquez "on 9/16/15 and thereafter, [] failed to notify his parole officer that he established a significant relationship with Maritza Wallace."  *Id.*

82.     Furthermore, the Supplementary Violation of Release Report charged Mr. Marquez with violating Rule 7, a general condition broadly prohibiting "fraternization" with anyone with a criminal record, alleging that "on 9/16/15, and thereafter, he has been fraternizing with Maritza Wallace [], whom he knows to have a criminal record, and without the knowledge and permission of his parole officer."  TMT Decl., Exh. C at 2.  At that time, Mr. Marquez still had the one SOMU reporting violation outstanding.  He had been reporting regularly since that time and attending scheduled court appearances to demonstrate his ongoing compliance.  It was his understanding that the charge would eventually be dismissed. *See id.* at 4.

83.     Mrs. Marquez likewise was charged with violating Rules 7 and 13 of her Conditions of Release to Parole Supervision, for having contact with Mr. Marquez "on or before 09/16/15. . . as evidenced by their marriage license."  TMT Decl., Exh. D1 at 3.

### *Mrs. Marquez Is Released and*
### *Mr. Marquez Is Sent to Prison*

84.     Mr. and Mrs. Marquez spent the next several months on Rikers Island pending the outcome of their respective hearings on the charges.

85.     On or around April 20, 2016, a hearing was held in Mr. Marquez's case.  Mr. Marquez was represented by Armando Lopez, an attorney with The Legal Aid Society's Parole Revocation Defense Unit.  At the conclusion of the hearing, an administrative law judge ruled that Mr. Marquez had violated Rules 7 and 13.  He was assessed 12 months in prison for the violations.  Declaration of Armando Lopez dated June 14, 2019 ("Lopez Decl.") at ¶4.

86.     Mrs. Marquez's hearing took place on or around April 21, 2016.  She was represented by attorney Joan Brown.  *See* TMT Decl., Exh. D2.  Mrs. Marquez submitted a letter expressing her regret for violating the rules.  TMT Decl., Exh. D3 at 21-22.  Without skirting responsibility, she explained that in Mr. Marquez, she had found someone who accepted her for who she was, and that she believed she might not find another man who would love her and marry her as he did because of her conviction.  The administrative law judge presiding over her case released Mrs. Marquez back to community supervision, with Rules 7 and 13 still in place. Declaration of Joan Brown dated August 9, 2019 ("Brown Decl.") at ¶5.

87.     On or around May 3, 2016, Ms. Brown wrote a letter to Defendant Uzzell requesting that DOCCS rescind Rules 7 and 13 from Mrs. Marquez's conditions of supervision. Ms. Brown argued that prohibiting her client from having any contact with her husband for the duration of her 20-year period of PRS was arbitrary and capricious and violated her constitutional right to associate with her family.  *See* TMT Decl., Exh. E (Post-Hearing Letter by Joan Brown dated May 3, 2016); Brown Decl. at ¶6.

17

88.     On or about July 29, 2016, Defendant Parker from DOCCS's Queens parole office called Ms. Brown and informed her that he did not have an issue with Mrs. Marquez seeing Mr. Marquez, and that "Manhattan is the problem."  Ms. Brown asked Defendant Parker if Mrs. Marquez could write to her husband and send him money in prison, and Parker responded that that would not be a problem.  Brown Decl. at ¶¶7-8.

89.     Around this time, Mrs. Marquez asked Defendant Fuller if she could write to or call her husband and fill his commissary.  Defendant Fuller responded that he would check with his superiors; he subsequently gave Mrs. Marquez verbal permission to send letters and funds to Mr. Marquez. Mrs. Marquez requested this approval in writing, but Fuller informed her he could not put anything in writing until he knew whether Mr. Marquez's parole officers in Manhattan would be allowing him to see Mrs. Marquez once he had served his 12-month assessment and was released back to the community.

90.     Mrs. Marquez also requested that she be allowed to travel to DOCCS's Great Meadow Correctional Facility in Washington County, where Mr. Marquez was being held. Defendant Fuller conferred with Defendants Parker and Uzzell.  Defendant Parker informed Mrs. Marquez that they could not allow her to see Mr. Marquez yet; he reiterated that while officials in Queens DOP had no problem with her seeing Mr. Marquez, they needed to make sure that their counterparts in Manhattan would be allowing Mr. Marquez to have contact with her upon his release.  Defendant Parker told her to be patient, and she responded that she would do so.

### Mr. Marquez Tries To Determine
### If He Will Be Permitted
### To Be With His Wife Upon Release

91.     During this term of incarceration, Mr. Marquez was diagnosed, for the first time in his life, with a mental illness — schizoaffective disorder, bipolar type — and began receiving treatment.  *See* TMT Decl., Exh. A at 9-11, 16-17.

18

92.     While Mr. Marquez was serving his 12-month assessment, Mr. Lopez, who represented Mr. Marquez at his April 2016 hearing on Rikers Island, reached out to Defendant Medina on multiple occasions in an effort to determine whether Mr. Marquez would be allowed contact with his wife upon his release from prison.

93.     Mr. Lopez did not hear back from Defendant Medina, and on or around January 19, 2017, Mr. Lopez emailed a letter to Defendant Medina arguing that a no-contact provision such as the one previously imposed on Mr. Marquez would violate his constitutional rights.  *See* TMT Decl., Exh. F (Letter by Armando Lopez and Response by Lewis Squillacioti), at 1-6.

94.     On or around February 3, 2017, Mr. Lopez was finally able to speak with Defendant Medina.  In a phone conversation that day, Defendant Medina told Mr. Lopez that his letter had been forwarded to Defendant Lewis Squillacioti, who at the time was a bureau chief for DOCCS's Division of Parole in Manhattan.  Upon information and belief, Defendants R. Hamilton and Mercedes were also consulted about Mr. Lopez's request.

95.     Thereafter, Mr. Lopez and Mr. Marquez's counsel in the instant case reached out to Defendant Squillacioti multiple times to determine whether the no-contact condition would be re-imposed upon Mr. Marquez's release.

96.     Around this time, Mr. Marquez signed conditions of PRS in anticipation of his release from prison that did not include the condition that he not see or communicate with Mrs. Marquez.  *See* TMT Decl., Exh. G1 (Conditions of PRS for Y. Marquez).

97.     On or around February 13, 2017, Mr. Lopez spoke on the phone with Defendant Squillacioti, who informed Mr. Lopez that the matter had been referred to DOCCS's regional director; upon information and belief, the regional director overseeing community supervision matters arising out of Manhattan at the time was Defendant William Hogan.

98.    Mr. Lopez continued to follow up with Defendant Squillacioti but did not learn of DOCCS' position until after Mr. Marquez's release.  Defendant Squillacioti apparently relayed Defendant Hogan's determination in a letter dated March 13, 2017.  Despite his completion of his term of incarceration, DOCCS would re-impose the same special condition on Mr. Marquez. TMT Decl., Exh. F at 7.  Thus began DOCCS's current installment of the infringement on Plaintiffs' fundamental rights.

### Defendants Restrict Plaintiffs' Fundamental Rights:
### Mr. Marquez Is Released from DOCCS Custody
### But Not Allowed to Associate with His Wife

99.    On or around March 15, 2017, Mr. Marquez was released from DOCCS prison to Ana's Place, a homeless shelter in the Bronx serving individuals with mental illness.  Parole Officer John Doe accompanied Mr. Marquez on the drive to the residence.  At the end of the ride, at or around 7 p.m., Officer Doe informed Mr. Marquez that he was not to have any contact with Mrs. Marquez.  Officer Doe also handed Mr. Marquez a written list of conditions of PRS; the list included the special condition that Mr. Marquez have no contact with Mrs. Marquez.  *See* TMT Decl., Exh. G2 at 2.  Officer Doe did not explain why the condition was being imposed.

100.    The following day, on or around March 16, 2017, Mr. Marquez reported to DOCCS's DOP office in Manhattan as instructed by Defendant Doe.  He met with Defendant Rodriguez, who ordered him to have no contact with Mrs. Marquez.  Officer Rodriguez also required Mr. Marquez to sign a special condition of PRS stating that, for the duration of his supervision:

> I, Marquez, Yancy am aware that I may not have contact with Maritza Wallace, contact meaning but not limited to face to face contact, telephone, text, email, social media such as Instagram, face book, twitter [*sic*].

*See* TMT Decl., Exh. G2 at 4. Rodriguez did not explain why the condition was being imposed.

### *Yancy Marquez's Post-Release Supervision*
### *Is Transferred to Bronx County and*
### *the No-Contact Provision Is Removed*

101.    On or around August 16, 2017, after Mr. Marquez had been living at Ana's Place in the Bronx for about five months, DOCCS transferred his PRS to the Bronx.

102.    Defendant Parole Officer McEwen, of the DOP's Bronx office, was assigned to supervise Mr. Marquez.  At Mr. Marquez's first meeting with Officer McEwen in or around August 2017, she handed him his written conditions of PRS.  It no longer included the special condition prohibiting him from having contact with Mrs. Marquez.  Mr. Marquez inquired if he could see his wife, and Officer McEwen responded that, from her perspective, it would not be an issue.  *See* TMT Decl., Exh. G3 (no-contact provision notably absent from seven-page list of special conditions).[12]

103.    Mr. Marquez was overjoyed and immediately got in touch with Mrs. Marquez. Mrs. Marquez, believing that the only obstacle that had been keeping her from being with her husband was the special condition imposed on *him* by his parole officers in Manhattan, was likewise elated.

104.    On August 27, 2017, the couple celebrated Mr. Marquez's 31st birthday together. This was the first time they were able to freely associate since Mr. Marquez's release from DOCCS custody in March 2017.

105.    Mr. and Mrs. Marquez began looking for a place to live together.  Mr. Marquez had been rehired at the Applebee's restaurant where he had worked prior to serving his one-year sentence at Great Meadow Correctional Facility.  With two incomes, they believed they could rent a modest apartment and begin building a life together.

---

[12]    Plaintiffs do not have a copy of the first written conditions Mr. Marquez signed in the Bronx in August 2017; he subsequently signed another copy, on November 10, 2017.

21

106.    Finding an apartment they could afford, which also met the requirements of New

York Executive Law Section 259-c(14) — that the home not be within 1,000 feet of a school —

was no easy task.[13]  But the couple spent many hours contacting landlords and visiting listings

online and in person.

107.    During this time, Mrs. Marquez repeatedly discussed the apartment search with

her parole officer, Aiesha Quick, who had been assigned to supervise Mrs. Marquez in or around

February 2017.  Officer Quick was encouraging whenever Mrs. Marquez spoke of her plans to

move in, finally, with her husband.[14]

108.    Indeed, Officer Quick asked Mrs. Marquez about the apartment hunt and about

how Mr. Marquez was doing at almost every office visit.  In response, Mrs. Marquez often

showed Officer Quick pictures Mrs. Marquez had taken of herself and Mr. Marquez together.

### The Restrictions Are Reinstated Without Explanation

109.    On or around November 27, 2017, Mr. Marquez was assigned to a new parole

officer, Defendant Lofton.  Upon information and belief, Senior Parole Officer Hamilton and

Defendant Medina, who had transferred to the DOP's Bronx office from the DOP's Manhattan

office (where he had previously supervised Mr. Marquez), were Officer Lofton's supervisors

and/or involved in supervising Mr. Marquez at the time.

---

[13]    This geographic restriction is imposed on Mr. and Mrs. Marquez because they are barred, while on PRS, from "entering into or upon any school grounds," which is defined as being within 1,000 feet of a school building. *See* N.Y. Exec. Law § 259-c(14); N.Y. Penal Law § 220.00. DOCCS enforces this limitation, commonly known as SARA, as a residency restriction and thus requires that Mr. and Mrs. Marquez find housing at least 1,000 feet away from any school.

[14]    Officer Quick supervised Ms. Marquez until around January 2018, and began supervising her again from around March 2019 to present. Quick is not named as a defendant in this lawsuit because, although she ultimately followed her supervisors' instructions, she displayed the most respect for Mrs. Marquez's fundamental liberties.

110.     When Officer Lofton met with Mr. Marquez, he acknowledged that there was no special condition prohibiting Mr. Marquez from having contact with his wife.

111.     However, Officer Lofton stated that he was contemplating whether to bar Mr. Marquez from seeing his wife under a general condition that applies to every individual on parole or PRS in the State of New York.  This condition, known as "Rule 7" of the General Conditions of Parole, states:

> I will not be in the company of or fraternize with any person I know to have a criminal record or whom I know to have been adjudicated a Youthful Offender except for accidental encounters in public places, work, school, or in any other instance with the permission of my Parole Officer.

*See Reporting Conditions*, New York State Community Supervision Handbook (*available at* https://doccs.ny.gov/community-supervision-handbook/community-supervision) (last visited Mar. 2, 2020); 9 N.Y.C.R.R. 8003.2(g).

112.     On or around November 30, 2017, Defendant Lofton informed Mr. Marquez, verbally, that he would be exercising his discretion to interpret Rule 7 to apply to Mr. Marquez's relationship with Mrs. Marquez.  In other words, although the special condition banning contact with his wife had been dropped, Rule 7 now operated as a general condition to prohibit Mr. Marquez from seeing or communicating with Mrs. Marquez in any way.

### Mr. and Mrs. Marquez Seek Clarification on the Need for the Restriction, and DOCCS Responds by Increasing Its Oversight of the Prohibition's Enforcement

113.     On or around November 30, 2017, counsel for Mr. and Mrs. Marquez contacted Danielle May, an assistant counsel for DOCCS.  Counsel informed Ms. May that Mr. Marquez had been prohibited from seeing Mrs. Marquez under Rule 7, and that Mrs. Marquez's parole

officer, meanwhile, did not appear to have any problem with her seeing Mr. Marquez.  *See* TMT Decl. at ¶10.

114.    Ms. May responded that she would reach out to Mr. and Mrs. Marquez's respective parole officers in the Bronx and Queens.  Ms. May communicated to counsel that she would determine the status of their cases, and why there seemed to be a discrepancy in how the two parole offices were exercising their discretion to allow the couple to see each other.

115.    Ms. May further stated that the offices needed to communicate the reason for their exercise of discretion, and, with regard to Mr. Marquez, "clearly articulate" what he needed to do to work towards being able to see his wife.  Ms. May informed counsel that she would be in touch once she spoke with the respective parole offices.

116.    Counsel thereafter followed up with Ms. May.  On or around December 19, 2017, Ms. May said in an email to counsel that she had still not been able to communicate with Mr. Marquez's parole officer and that she would be in touch.

117.    Counsel again spoke with Ms. May on the phone on or around January 18, 2018. Ms. May informed counsel that she had finally communicated with Defendant Lofton in the Bronx.  Ms. May stated that Defendant Lofton had told her that Mr. Marquez was not permitted to see his wife based on "the nature and severity of both of their crimes," and based on Rule 7 of the General Conditions of Parole.  Ms. May confirmed that there was no special condition barring Mr. Marquez from having contact with his wife.  TMT Decl. at ¶10.

118.    Ms. May further informed counsel that she had not yet spoken with Mrs. Marquez's parole officer in Queens.  Ms. May stated, however, that Defendant Lofton checked his computer records and saw that Mrs. Marquez appeared to be subject to a special condition, effective August 2015, that she have no contact with Mr. Marquez.

119.    Ms. May stated that Defendant Lofton, along with his "bureau chief," planned to speak with Mrs. Marquez's parole officer via a conference call and report back to Ms. May about the substance of the call.  Ms. May stated that she would be in touch with counsel once she received word from Defendant Lofton following the conference call.

120.    Upon information and belief, in or around January 2018, Defendant Lofton contacted Officer Quick in Queens and asked if she was aware that Mrs. Marquez had been in contact with Mr. Marquez; Officer Quick responded in the affirmative.

121.    On or around January 19, 2018, Defendant Lofton asked Mr. Marquez if he had seen his wife.  Mr. Marquez admitted that they had seen each other on New Year's Day.  Defendant Lofton informed Mr. Marquez that, as a result, a GPS monitor would be placed on his ankle the following week.

122.    On or around January 25, 2018, counsel for Mr. and Mrs. Marquez spoke with Ms. May, who stated that she had spoken with Defendant Lofton the previous day; Ms. May said Defendant Lofton had explained to her that Mr. and Mrs. Marquez were both "high level offenders" and thus "deserving of serious scrutiny."  In his view, as articulated by Ms. May, they had committed "the same offense in terms of category of offense," and that "just like you wouldn't have two robbers living together, you wouldn't have two sex offenders living together" regardless of whether they were married or not.  TMT Decl. at ¶10.

123.    During a home visit on or around January 26, 2018, Defendant Lofton put an ankle monitor on Mr. Marquez.

124.    On or around January 24, 2018, Officer Quick called Mrs. Marquez and told her that she would no longer be allowed to see Mr. Marquez.  Officer Quick explained that her supervisor had told her that Mrs. Marquez was to stay away from her husband, and had

instructed Officer Quick to call and convey the message to Mrs. Marquez.  Officer Quick further

informed Mrs. Marquez that she would be assigned a new parole officer, Defendant Lindsy

Osouna.  Officer Quick was apologetic, but conveyed and enforced her superiors' message.

125.    On or around January 29, 2018, Mrs. Marquez was assigned to Defendant

Osouna.  Officer Osouna, accompanied by Defendant Neeley, a Senior Parole Officer in Queens,

issued Mrs. Marquez a special condition that she stay away from Mr. Marquez.  Defendants also

required Mrs. Marquez to sign a written statement to that effect.  *See* TMT Decl., Exh. H

(Conditions of PRS for M. Marquez dated Jan. 29, 2018), at 3.  In addition, Defendants Osouna

and Neeley informed Mrs. Marquez that they would be putting an ankle monitor on her to track

her physical movements.

126.    On or around February 2, 2018, Mrs. Marquez reported to the parole office, where

an ankle monitor was placed on her leg by Officer Quick.

127.    The ankle bracelets are heavy, bulky, and prone to malfunction.[15]  In addition, Mr.

and Mrs. Marquez believe that the devices, because of their visibility, have hindered their ability

to pursue job opportunities.  For example, Mrs. Marquez has been applying to work as a client

services specialist at homeless shelters — a job in which she previously excelled.  In or around

November 2018, was offered a position at the George Daly House in Manhattan.  However,

when she notified the employer that she was subject to monitoring through the ankle bracelet,

Mrs. Marquez was informed that she could not be hired as the position requires client-

interfacing.

---

[15]    Around April 2018, Mrs. Marquez's ankle monitor malfunctioned and she was falsely accused of
trying to block the signal. Although the issue was resolved, the monitors have added to the couple's
stress. They fear they may accidentally cross paths and, thus, be sent to prison for violating their no-
contact conditions. This scenario is not far-fetched. Earlier this year, Mr. and Mrs. Marquez's places of
employment were both located, coincidentally, in Flushing, Queens.

128.    Mrs. Marquez has repeatedly asked Defendant Osouna and others in the Queens parole office how long she would have to wear the ankle monitor.  However, defendants have not provided an answer.  In a meeting in or around May 2018 at the Queens parole office, Defendant Osouna told Mrs. Marquez that it might "lighten the situation" with the ankle bracelet if she divorced Mr. Marquez.  In several meetings that took place between September 2018 and November 2018, Defendant Parker, the Bureau Chief of DOCCS's Queens parole office, told Mrs. Marquez that the decision to place ankle monitor on her was made by someone more senior than he, and thus, the decision to remove it would also have to come from above.

129.    Upon information and belief, ankle monitoring of parolees generally end after no more than six months without incident.  To date, two years have passed since the ankle monitor was placed on Mrs. Marquez.  Defendant Parker has told Mrs. Marquez that he would ask senior DOCCS official(s) about removing the monitor.  However, Mrs. Marquez has received no information from Defendants.

### Though Alone for Now, Mr. and Mrs. Marquez Continue to Try to Better Their Lives

130.    Plaintiffs are distraught, fearful and anxious as a result of Defendants' arbitrary restriction and the manner in which they have imposed the ban.  Nevertheless, Mr. and Mrs. Marquez are determined not to lose hope and are trying to move forward with their lives, for now, alone.

131.    On or around March 22, 2018, Mrs. Marquez achieved a goal she had set for herself in 2013 when she was released from prison to a women's shelter: she got a place of her own.  Mrs. Marquez moved into an apartment, a large studio in Queens, with help from the city's Special One-Time Assistance program, or SOTA, a rental assistance incentive that provides landlords one year of full rent upfront with the goal of moving qualified residents of DHS

shelters to private housing.  To be eligible for SOTA, individuals must show proof that they have enough income to cover future rent payments.

132.    Mrs. Marquez has not missed a single rent payment.  She hopes Mr. Marquez will one day join her in the apartment, or that they can move to a new apartment, together.

133.    In the meantime, she continues to work hard to save money and better her life. For months, in between her shifts at Buffalo Wild Wings, she submitted job applications to various agencies to get back into the work she truly enjoyed—helping downtrodden residents in the city's homeless shelters.  In or around February 2019, she landed her dream job, as a client care worker, for a Company that coordinates services at various DHS shelters.

134.    In or around March 4, 2019, Mrs. Marquez began her new job as a client care worker.  She is based at a 300-bed facility in Manhattan.  She relishes going to work every day, and believes that with the right assistance and hard work, her clients can also accomplish many of their goals.

135.    Although she puts in long hours at the shelter—in addition to her regular, 40-hour work week, plus frequent overtime—Mrs. Marquez has continued to work part time at Buffalo Wild Wings.  This is because her mother suffered several strokes since the beginning of the year, requiring Mrs. Marquez to take out a loan so that she could send home to Jamaica additional money to help cover medical bills and related costs.  While she had hopes of returning to her work as a teacher, Mrs. Marquez's mother never recovered; she passed away in June 2019.

136.    Mr. Marquez also endeavored to save up for his own apartment, but it has not been easy.  In or around spring 2018, his work at Applebee's required him to work late nights, which he did not mind, but caused him to return to Ana's Place in the wee morning hours, to find that his bed had been given away to another client with mental illness in need of shelter.  The

shelter workers still let him in, but he had to rest in the common area, which left him sleep deprived.  The lack of sleep in turn affected his mental health, and in those moments, he felt particularly keenly the pain of not having his wife to talk to and draw strength from.

137.     Mr. Marquez hit a low point in March 2018, when he was accused of violating Rule 8 of the General Conditions of Parole, which prohibits individuals from, among other things, engaging in "behavior [which] threaten[s] the safety or well-being of [themselves] or others."  *See Reporting Conditions*, *available at* https://doccs.ny.gov/community-supervision-handbook/community-supervision.  Mr. Marquez was arrested and taken to Rikers Island pending a hearing on charges that, on June 7, 2018, he threatened the well-being of another male resident inside Ana's Place, by punching him in the left eye, and causing swelling and bleeding to that eye.  *Id.*  Mr. Marquez maintains that he did not strike the individual.

138.     No criminal charges were filed, either by the prosecutor or by the police, in connection with the alleged assault.  However, Mr. Marquez remained on Rikers pending the hearing on the parole violation.

139.     That hearing was held on or around August 6, 2018.  DOCCS, represented by a parole officer, came to the hearing and said it could not proceed with its case.  Shortly thereafter, Mr. Marquez was released to Ana's Place, where the other individual still resided, and where Mr. Marquez lived without incident until in or around October 2018, when he was transferred to another shelter in Manhattan.

140.     Upon release from Rikers, Mr. Marquez learned that his job at Applebee's had been filled during the two months he had spent in jail.  He was disappointed, but quickly sought other employment, diligently applying for jobs both in the restaurant industry and elsewhere.

141.     Around October 2018, he was transferred to a men's shelter on Ward's Island.

142.    In or around November 2018, Mr. Marquez's parole supervision was transferred

back to Manhattan from the Bronx.  Defendant Parole Officer A. Conyers was assigned to

supervise Mr. Marquez, and, upon information and belief, Defendant Supervising Parole Officer

J. Kennedy was Defendant Conyers's supervisor.  Defendant Conyers has done nothing to alter

the blanket ban keeping Mr. and Mrs. Marquez from communicating with each other; and, upon

information and belief, Defendant Kennedy is comfortable with maintaining the blanket ban.

143.    In or around early December 2018, Mr. Marquez went back to The Fortune

Society.  He applied for, and was accepted into, its job training program.  He enrolled in its

intensive GED program.  He also sought mental health treatment through Fortune's Better Living

Center, as well as counseling, which he was no longer getting through his shelter placement after

being transferred out of Ana's Place.  *See* TMT Decl., Exh. A at 3.

144.    Allison Power, a therapist at the Fortune Society who had begun working with

Mr. Marquez on a weekly basis in or around early January 2019, observed that Mr. Marquez was

motivated to complete his GED.  He was also was making steady progress in therapy,

particularly in the areas of anger management and consequential thinking.

145.    On or around March 11, 2019, on his way home from The Fortune Society, Mr.

Marquez was stopped at the Queens Plaza subway by two police officers who observed him

jump the turnstile.

146.    Although the NYPD no longer arrests people for turnstile jumping, Mr. Marquez,

because of his parolee status, was taken into custody.[16]

---

[16]    Policy changes implemented by the NYPD in recent years have led the police to issue
summonses to, rather than arrest, the vast majority of people caught turnstile jumping (theft of
services under P.L. § 165.15).  *See, e.g.*, Zolan Kanno-Youngs & Melanie Grayce West, *New
York City Fare-Beaters Get a Slide in the Subway*, The Wall Street Journal, Aug. 1, 2018
(https://www.wsj.com/articles/new-york-city-fare-beaters-get-a-slide-in-the-subway-

147.    Despite posting $1 bail for the theft of services charge, a misdemeanor offense under N.Y. Penal Law § 165.15, Mr. Marquez remained incarcerated on Rikers Island on a parole warrant; his turnstile jumping case triggered charges that he violated Rule 8 of the General Conditions of Parole, which prohibits individuals from "behav[ing] in such manner as to violate the provisions of any law to which [they are] subject, which provides for a penalty of imprisonment … or threaten[s] the safety or well-being of [them]selves or others." *See Reporting Conditions*, *available at* https://doccs.ny.gov/community-supervision-handbook/community-supervision.

148.    During the two months while his parole case was pending, Mr. Marquez took advantage of, and successfully completed, various programs offered by The Osbourne Association's jail-based community reentry program.  *See* TMT Decl., Exh. A at 4-8.

149.    On or around May 23, 2019, Mr. Marquez pled guilty to violating the conditions of PRS by trespassing on the subway.  He was assessed 12 months in prison, with the opportunity for earlier release if he completed a 90-day drug treatment program.

150.    On or around June 27, 2019, Mr. Marquez pled guilty to theft of services for jumping the turnstile, and was sentenced to 90-days, which was to run concurrent to the parole violation assessment.[17]

---

1533168095); Alison Fox & Vincent Barone, *Turnstile Jumpers With Open Summonses Will No Longer Be Arrested, NYPD says*, amNewYork, Aug. 1, 2018 (https://www.amny.com/news/fare-evasion-arrests-nyc-1.20238070).

[17]    Mr. Marquez successfully completed the 90-day treatment program and was released from DOCCS custody in October 2019. However, he was arrested in November 2019 on allegations that he possessed synthetic marijuana, or K2. In December 2019, the case was adjourned in criminal court in contemplation of dismissal. However, Mr. Marquez remains incarcerated on Rikers Island as a result of parole violation charges triggered by the K2 arrest.

***An Expert Determines that***
***Mr. and Mrs. Marquez***
***Do Not Pose a Risk to Each Other, and That***
***a Supportive Relationship Between the Two***
***Decreases, Rather than Increases, Any Risk***
***Plaintiffs Pose to Society***

151.    Defendants' enforcement of this arbitrary prohibition has been erratic, sowing

confusion and interfering with the couple's ability to plan for the future and to establish stable

lives.  It has also been extremely demoralizing, causing the couple immeasurable emotional

harm.

152.    This should come as no surprise given the natural consequences of forcefully

separating martial partners.  In the Marquez's case, this separation has also destroyed the support

system both Mr. and Mrs. Marquez relied on as they reintegrated into society.[18]

153.    Indeed, Jeffrey Singer, an expert in the assessment of the recidivism risks of sex

offenders, evaluated Mr. and Mrs. Marquez and concluded that they present no risk to each

other, and in fact, that their association reduces their combined risk of recidivism.  He also

deemed each to have low risks of sexual recidivism.  *See* TMT Decl., Exh. I (Forensic

Psychological Evaluation and Risk Assessment, Dr. Jeffrey Singer, dated April 8, 2019), at 2-3.

154.    Specifically, Dr. Singer notes that the periods Mr. and Mrs. Marquez spent

together in the community were marked not by problematic behavior but by gains in their

individual rehabilitative efforts.  *See* TMT Decl., Exh. I at 3.  In his professional opinion, if Mr.

and Mrs. Marquez were "allowed to be together, they [would] support each other in their daily

lives, thereby mitigating and decreasing the risk of sexual re-offense, and of criminal re-offense

in general."  *Id.*  Dr. Singer adds: "[i]t is also my opinion that the current ban on their

---

[18]    For Mr. Marquez, DOCCS's decisions have exacerbated his mental illness and substance abuse issues. For Mrs. Marquez, the forced separation has resulted in hopelessness and isolation, leading her to engage in an ill-fated dalliance in 2019 that quickly deteriorated.

relationship has only the potential to harm their individual rehabilitative processes.  It is, therefore, my recommendation that this couple… have unfettered access to each other, of the kind which is afforded any other married couple." *Id.*  ("[T]he couple's attachment to each other is a source of emotional support that enhances both of their rehabilitative processes.").

155.    Indeed, Dr. Singer concluded that "Mr. Marquez's recent minor infractions likely stem from the increased stress he is experiencing by being forcefully separated from Mrs. Marquez." TMT Decl., Exh. I at 14.

156.    In sum, Defendants' actions have left Plaintiffs distressed, frightened and grieving the loss of their marriage.  Both have suffered mental anguish and distress, which is particularly problematic given Mr. Marquez's serious mental illness, and because Mr. and Mrs. Marquez are still learning to manage and recover from their respective childhood traumas.

157.    Despite repeated requests for clarification on the basis of the ongoing restriction and for consideration of their right to associate as a married couple since Mr. Marquez's initial release from prison, Defendants have provided no answers, no plan for rehabilitation, and no consistent message.

158.    It is clear to Plaintiffs that Defendants have no plan to ever allow their union to continue, and would rather thwart it than permit Mr. and Mrs. Marquez to build a life together. Left unchecked, this condition is likely to continue until 2034, when Mrs. Marquez is released from her term of supervision.

### *This Is Not the First Time that DOCCS Has Unfairly Restricted Fundamental Liberties, Nor the First Time DOCCS Has Been Presented with this Particular Issue*

159.    Upon information and belief, in 2017, another court in this District granted summary judgment on a finding of supervisory liability with regard to a similar restriction of a

parolee's fundamental liberties. *See Doe v. Lima*, 270 F. Supp. 3d 684, 702 (S.D.N.Y. 2017), *aff'd sub. nom*, *Doe v. Cappiello*, 758 Fed. App'x 181 (2d Cir. 2019).  Notably, that case also involved the supervisor Defendant Lima.

160.    Further, upon information and belief, other sex offenders who have sought permission to cohabitate with individuals with criminal convictions have received such permission in other jurisdictions in New York, demonstrating the degree to which the restrictions in this case are arbitrary.

161.    Upon information and belief, in Suffolk County, for example, parole officers have imposed less-restrictive conditions that addressed specific concerns rather than resorting to a blanket ban in the first instance.  In or around 2011, an individual on PRS for a sex offense notified his parole officer that he wanted to pursue a relationship with a woman he had recently met.  Even when DOCCS became aware that the girlfriend had a drinking problem (after other supervisees living in a group home with the boyfriend complained about her behavior), the DOP in Suffolk did not ban the relationship.  Instead, it explained to the boyfriend that her showing up drunk at the residence could impede on his rehabilitation as well as that of the other residents, and conditioned the relationship on his girlfriend's ability to become sober.  She entered and successfully completed a treatment program, and the couple was allowed to associate; they went on to marry, to live together as a family, and to have a child.

162.    Upon information and belief, in another case, parole officers, recognizing the fundamental rights of individuals under their supervision to marry and live as a family, have withdrawn previously-imposed, no-contact provisions once a couple married.  In or around 2013, a woman serving PRS on Long Island for a sex offense against a minor began a relationship with a man on PRS for a theft offense; she kept the relationship secret despite a condition that

mandated her to tell her parole officer.  When the officer found out, she was sent to prison for violating the condition.  When she was released, the parole officer imposed a no-contact condition.  However, the couple continued their relationship in secret and eventually married. When local DOCCS officers found out that the relationship had formalized into a legal union, the condition was removed on grounds that that they could not ban contact between spouses.

**CLAIMS FOR RELIEF**

I.     **VIOLATIONS OF FUNDAMENTAL LIBERTIES PROTECTED BY SUBSTANTIVE DUE PROCESS, FREEDOM OF ASSOCIATION, AND/OR MARITAL PRIVACY**

163.     Plaintiffs re-assert and re-allege the factual allegations contained in ¶¶ 1-162.

164.     The Fourteenth Amendment to the U.S. Constitution provides that no "State shall deprive any person of life, liberty, or property, without the due process of law."  Certain liberty interests are so fundamental that they cannot be deprived regardless of the procedures employed or justifications offered by the State, except in rare circumstances.

165.     Indeed, Plaintiffs have a fundamental liberty interest protected by the Fourteenth Amendment in their marital relationship and in their ability to live together as a family unit.  This is also sometimes referred to as the fundamental right to intimate association: the right to create and sustain a marriage, and to cohabit with one's spouse.  Although this right is generally enforced through the Due Process clause of the Fourteenth Amendment, *see, e.g.*, *Obergefell v. Hodges*, 135 S. Ct. 2584, 2598 (2015), to the extent this Court would interpret that right exclusively through or in conjunction with the First Amendment's grant of the right of freedom of association, Plaintiffs additionally point to that provision of the Constitution as a source of Plaintiffs' fundamental rights.  *See Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 57 (2d Cir. 2014).

35

166.     The Defendants' restriction of Mr. and Mrs. Marquez's marital contact since Mr. Marquez's release from prison (*see* Paragraphs 92-129 above) in March 2017 substantially infringes upon these interests.

167.     As a result of Defendants' actions, and until Plaintiffs receive the permission of their respective parole officers, Mr. and Mrs. Marquez are completely prohibited from having any contact with one another until the year 2034 (when Mrs. Marquez's term of PRS is set to end).  Such permission has not been forthcoming, nor has it been made contingent on any goals.

168.     Defendants have intermittently issued and enforced special conditions on Plaintiffs that they not associate with each other, and have also enforced a general condition of parole, known as the anti-fraternization rule, to keep Plaintiffs apart, with no regard for the impact of these prohibitions on their fundamental rights.

169.     Defendants' restrictions deprive Plaintiffs of their fundamental liberty interests without any compelling state interests narrowly tailored to accomplish Defendants' purported public purpose of providing "supportive services [to those] under community supervision to facilitate a successful completion of [a releasee's] sentence."  *See Mission*, *DOCCS Community Supervision*, *available at* https://doccs.ny.gov/community-supervision.

170.     Plaintiffs have each suffered damages as a result of Defendants' deprivation of their constitutional rights.

## II.     VIOLATIONS OF PROCEDURAL DUE PROCESS

171.     Plaintiffs re-assert and re-allege the factual allegations contained in ¶¶ 1-170.

172.     Plaintiffs Yancy and Maritza Marquez have fundamental liberty interests protected by the First and Fourteenth Amendments in establishing a home and sustaining a family unit.

36

173.     Since Mr. Marquez was released from prison, Defendants have imposed PRS conditions restricting Mr. Marquez's contact with Mrs. Marquez, and vice versa, without adequate written notice regarding their intent to impose these conditions, without providing them with the factual basis for the conditions, and without providing them with information regarding how their past conduct relates to the conditions.

174.     Due process requires timely and adequate notice detailing Defendants' reasons for imposing the "no contact" conditions, as well as a meaningful opportunity for Mr. and Mrs. Marquez to challenge the imposition of the conditions.

175.     Defendants' interference with the liberty interests of Mr. and Mrs. Marquez without a clear and consistent protocol and adequate procedural protections creates a constitutionally intolerable risk of erroneous deprivation of Plaintiffs' fundamental rights and unlawfully restricts Plaintiffs' fundamental liberty interests.

176.     Defendants have no legitimate governmental interest that outweighs the benefits of providing Mr. and Mrs. Marquez, as well as other releasees, adequate procedural safeguards and a protocol that sets forth a clear legal standard based on a limited and clearly-articulated set of factors for a hearing officer to consider, thereby reducing the risks of Defendants' erroneous deprivation of Plaintiffs' liberty interests.

177.     Plaintiffs have each suffered damages as a result of Defendants' deprivation of their constitutional rights.

### RELIEF REQUESTED

WHEREFORE, Plaintiffs request that the Court:

a.     Assume jurisdiction of this case;

b.     Declare that Defendants' restrictions on Yancy Marquez's contact with Maritza Marquez, and vice versa, are unconstitutional;

37

c.     Issue a preliminary and permanent injunction permanently barring enforcement of the challenged conditions of PRS on Yancy and Maritza Marquez;

d.     Award Plaintiffs monetary damages for the violations of their constitutional rights, for their pain and suffering, and to compensate them for expenses incurred as a result of Defendants' actions;

e.     Award Plaintiffs costs and attorneys' fees per 42 U.S.C. § 1988; and

f.     Grant such other and further relief as the Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

Dated:  March 5, 2020

Respectfully submitted,

*Attorneys for Plaintiffs*
*Maritza Marquez and Yancy Marquez*

By:     ___/s/ John D. Winter_____

Tomoeh Murakami Tse                 John D. Winter
Will A. Page                        Christina Seda-Acosta

THE LEGAL AID SOCIETY               PATTERSON BELKNAP
 CRIMINAL APPEALS BUREAU             WEBB & TYLER LLP
199 Water Street, 5th Floor         1133 Avenue of the Americas
New York, New York 10038            New York, New York 10036
Tel: 212.577.3300                   Tel: 212.336.2000
tmurakamitse@legal-aid.org          jwinter@pbwt.com
wpage@legal-aid.org                 cseda@pbwt.com