UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARITZA MARQUEZ and
YANCY MARQUEZ,

Plaintiffs,

– against –

ANTHONY J. ANNUCCI, Acting Commissioner of the New York State Department of Corrections and Community Supervision, *in his official capacity only*; WILLIAM HOGAN, Regional Director of New York State Department of Corrections and Community Supervision; JOSEPH LIMA, Area Supervisor for the New York State Division of Parole; Bureau Chief LEWIS SQUILLACIOTI; Senior Parole Officer M. MEDINA; Parole Officer ROSA NUNEZ; Senior Parole Officer R. HAMILTON; Senior Parole Officer KEVIN UZZELL; Senior Parole Officer NEELEY; Bureau Chief MARK PARKER; Parole Officer ALEXANDRA MANDERSON; Parole Officer BRIAN FULLER; Parole Officer MERCEDES; Parole Officer JOHN DOE; Parole Officer RODRIGUEZ; Parole Officer McEWEN; Parole Officer LOFTON; Senior Parole Officer HAMILTON; Parole Officer LINDSY OSOUNA; Senior Parole Officer J. KENNEDY; and, Parole Officer A. CONYERS,

Defendants.

20 Civ. 1974 (AKH)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

**MEMORANDUM OF LAW**
**IN SUPPORT OF**
**A PRELIMINARY INJUNCTION**
**PURSUANT TO FED. R. CIV. P. 65**

## TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. STATEMENT OF FACTS ..... 2

III. ARGUMENT ..... 10

A. Plaintiffs Will Continue To Suffer Irreparable Injury Absent A Preliminary Injunction ..... 11

B. There Is A Clear And Substantial Likelihood That Plaintiffs Will Prevail On The Merits ..... 12

i. Plaintiffs Have a Fundamental, Constitutional Right to Marry and to Live Together as a Family ..... 13

ii. The State's Proffered Reason for Breaking Apart Plaintiffs' Marriage Has Been Rejected by Other Courts as Insufficient ..... 15

iii. The State's Theoretical Justifications for Separating Plaintiffs Are Likewise Insufficient ..... 18

iv. Blanket Elimination of Plaintiffs' Fundamental Rights—Without Any Procedural Protection—Fails to Advance the State's Interests and Is Not Narrowly Tailored ..... 20

C. A Preliminary Injunction Is In The Public Interest ..... 22

IV. CONCLUSION ..... 23

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*African Trade & Info. Ctr., Inc. v. Abromaitis*,
294 F.3d 355 (2d Cir. 2002)....................12

*Askins v. Doe No. 1*,
727 F.3d 248 (2d Cir. 2013)....................12

*Bostic v. Jackson*,
No. 04 Civ. 676 (NAM), 2008 WL 1882696 (N.D.N.Y. Apr. 24, 2008) ....................18

*Chi Iota Colony of Alpha Epsilon Pi Fraternity v. City Univ. of New York*,
502 F.3d 136 (2d Cir. 2007)....................14

*Cleveland Bd. of Educ. v. LaFleur*,
414 U.S. 632 (1974)....................13

*Conn. Dep't of Envtl. Prot. v. Occupational Safety & Health Admin.*,
356 F.3d 226 (2d Cir. 2004)....................11

*Dawson v. State*,
894 P.2d 672 (Alaska Ct. App. 1995)....................22

*Doe #1 v. Marshall*,
No. 15 Civ. 606 (WKW), 2018 WL 1321034 (M.D. Ala. Mar. 14, 2018)....................16

*Doe v. Cappiello*,
758 F. App'x 181 (2d Cir. 2019) ....................10, 14, 21

*Doe v. Lima*,
270 F. Supp. 3d 684 (S.D.N.Y. 2017), *aff'd sub. nom*, *Doe v. Cappiello*, 758 F. App'x 181 (2d Cir. 2019) ....................12, 14, 21

*Elrod v. Burns*,
427 U.S. 347 (1976)....................11

*Geiger v. Kitzhaber*,
994 F. Supp. 2d 1128 (D. Or. 2014) ....................22

*Goldberg v. Kelly*,
397 U.S. 254 (1970)....................14

*Langone v. Coughlin*,
712 F. Supp. 1061 (N.D.N.Y. 1989)....................13

*Loving v. Virginia*,
388 U.S. 1 (1967)....11

*Lyng v. Castillo*,
477 U.S. 635 (1986)....13

*M.L.B. v. S.L.J.*,
519 U.S. 102 (1996)....13

*Mathews v. Eldridge*,
424 U.S. 319 (1976)....14

*Meyer v. Nebraska*,
262 U.S. 390 (1923)....13

*Moore v. City of East Cleveland*,
431 U.S. 494 (1977)....13, 16

*New York Progress & Prot. PAC v. Walsh*,
733 F.3d 483 (2d Cir. 2013)....10, 22

*Nken v. Holder*,
556 U.S. 418 (2009)....10, 23

*Obergefell v. Hodges*,
135 S. Ct. 2584 (2015)....11, 13

*People v. Howland*,
145 A.D.2d 866 (3d Dep't 1988).... 17-18

*Project Release v. Prevost*,
463 F. Supp. 1033 (E.D.N.Y. 1978)....13

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984)....10

*Robinson v. New York*,
486 F. App'x 905 (2d Cir. 2012)....12

*Smith v. Org. of Foster Families For Equality & Reform*,
431 U.S. 816 (1977)....13, 14

*Tom Doherty Assoc. v. Saban Entm't, Inc.*,
60 F.3d 27 (2d Cir. 1995)....12

*Tremper v. Ulster County Dep't of Probation*,
160 F. Supp. 2d 352 (N.D.N.Y. 2001)....12, 16, 17, 19

*Turner v. Safley*,
482 U.S. 78 (1987)....................13

*United States v. Chong*,
217 F. App'x 637 (9th Cir. 2007)....................22

*United States v. Hobbs*,
845 F.3d 365 (8th Cir. 2016)....................14, 22

*United States v. Myers*,
426 F.3d 117 (2d Cir. 2005)....................14, 15, 21

*United States v. Napulou*,
593 F.3d 1041 (9th Cir. 2010)....................14, 16, 17, 19

*United States v. Reeves*,
591 F.3d 77 (2d Cir. 2010)....................14, 19, 22, 23

*United States v. Roberts*,
2007 WL 2221416 (E.D. Pa. July 31, 2007)....................22

*United States v. Smith*,
606 F.3d 1270 (10th Cir. 2010)....................14

*United States v. Voelker*,
489 F.3d 139 (3d Cir. 2007)....................15

*Washington v. Glucksberg*,
521 U.S. 702 (1997)....................15

*Williams v. New York State Div. of Parole*,
71 A.D.3d 524 (1st Dep't 2010)....................18, 19

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008)....................10

*Zablocki v. Redhail*,
434 U.S. 374 (1978)....................10, 15

**Statutes and Rules**

N.Y. Corr. Law § 168-a *et seq.*....................3
N.Y. Penal Law § 130.50(2)....................2
N.Y. Penal Law § 130.50-a(3)....................2
N.Y. Penal Law § 260.32(4)....................2
7 N.Y. C.R.R. 711.2(a)(4)....................13
9 N.Y. C.R.R. 8003.2....................4

**Other Authorities**

DOCCS Directive 4201, *Marriages During Confinement* (March 15, 2012) ..............................13

Mark T. Berg & Beth M. Huebner, *Reentry and the Ties that Bind: An Examination of Social Ties, Employment, and Recidivism*, 28 Justice Quarterly 382 (2011)..........................................................................................................11

Max B. Bernstein, *Supervised Release, Sex-Offender Treatment Programs, and Substantive Due Process*, 85 FORDHAM L. REV. 261, 284-86 (2016).....................................15

R. Sampson *et al.*, *Does Marriage Reduce Crime? A Counterfactual Approach To Within-Individual Causal Effects*, CRIMINOLOGY, Vol. 44 No. 3 (2006) ................................19

Robbe, Mann, Maruna & Thornton, *An Exploration of Protective Factors Supporting Desistance From Sexual Offending*, 27 Sexual Abuse Journal 16 (2015)..........................................................................................................11

## I. INTRODUCTION

Plaintiffs Maritza Marquez (née Wallace) and Yancy Marquez fell in love and made their commitment to one another permanent through a legal union. They want nothing more than to live their lives together, and to support each other, as husband and wife. But Defendants have imposed conditions of post-release supervision that make their family vision impossible: the Marquezes can have no contact. They risk re-incarceration if they see or talk to each other.

Mr. and Mrs. Marquez have no history of domestic violence and pose no danger to each other. The only reason Defendants have given for the restriction is that Plaintiffs were convicted of sex offenses. The unrelated convictions alone, however, cannot justify this ban on spousal contact. Defendants have never considered less intrusive ways of overseeing Plaintiffs' conduct, but rather, resorted to a blanket denial of their fundamental rights to intimately associate.

Experts with experience in evaluating the recidivism risks of sex offenders have found that, in general, supportive, age-appropriate relationships reduce the risk of re-offense. This is true for Mr. and Mrs. Marquez. In fact, an expert in the assessment and treatment of sex offenders evaluated Plaintiffs and found that they do not pose a risk to each other. To the contrary, the expert concluded that it would benefit both Plaintiffs and society if they were together, and that their forced separation is more likely to harm their individual rehabilitation than encourage it. Defendants' arbitrary refusal to allow the Marquezes to have any contact, without considering less intrusive alternatives or the available science on the risk of recidivism, is causing Plaintiffs severe and irreparable harm, rather than facilitating rehabilitation.

Given the gravity of the constitutional violations, this Court should grant Plaintiffs' request for a preliminary injunction to prevent further infringement on Plaintiffs' rights during the pendency of this litigation.

## II. STATEMENT OF FACTS[1]

Plaintiff Maritza Marquez is 30 years old. (Declaration of Maritza Marquez, dated February 18, 2020 ("MM Decl.") ¶ 1.) Plaintiff Yancy Marquez is 33 years old. (Declaration of Yancy Marquez, dated February 14, 2020 ("YM Decl.") ¶ 1.) They married on September 16, 2015. (Declaration of Tomoeh Murakami Tse, dated February 18, 2020 ("TMT Decl."), ECF No. 23, Exh. D3 at 12; MM Decl. ¶ 23; YM Decl. ¶ 23.)

***Background***

Before Plaintiffs met and married, they were independently convicted of sex offenses. These convictions were the first, and only, sex offense convictions for both Mr. and Mrs. Marquez—and, in fact, their only criminal convictions. (Compl., ECF No. 1, ¶¶ 38, 39.) Mr. Marquez's offense involved a male minor, while Mrs. Marquez's offense involved an elderly woman. Mr. Marquez pleaded guilty on October 3, 2008, to criminal sexual act in the first degree, N.Y. Penal Law § 130.50(3), and was sentenced to five years in prison and 10 years of post-release supervision ("PRS"). (Compl. ¶ 38.) Mrs. Marquez, then Maritza Wallace, pleaded guilty on July 15, 2010, to criminal sexual act in the first degree, N.Y. Penal Law § 130.50(2), and endangering the welfare of a vulnerable elderly person in the second degree, N.Y. Penal Law § 260.32(4). (Compl. ¶ 39.) She was sentenced to five years in prison and 20 years of PRS. (*Id.* ¶ 40.) While incarcerated, Mr. and Mrs. Marquez demonstrated their commitment to rehabilitation, and successfully engaged in various programs. (Compl. at ¶¶ 41-45; TMT Decl., Exh. B; MM Decl. ¶ 12; YM Decl. ¶¶ 10-11.)

---

[1] The facts alleged in Plaintiffs' complaint are incorporated and referenced in the following overview. Particular focus is placed, however, on the ongoing prohibition against Plaintiffs' intimate association, the subject of this motion for injunctive relief. Plaintiffs have also provided declarations evidencing pertinent facts.

When Mr. and Mrs. Marquez were released from prison, they were each classified as level three sex offenders pursuant to New York's Sex Offender Registration Act, codified as N.Y. Corr. Law § 168-a *et seq*. (Compl. ¶¶ 46, 58.) They continued their self-improvement and rehabilitation in the community, attending not just programs mandated by their PRS but also those they sought out on their own, including at The Fortune Society. (Compl. ¶¶ 56, 60, 65, 66; MM Decl. ¶¶ 14-16; YM Decl. ¶¶ 13-17.)

***Plaintiffs Meet and Begin Supporting Each Other***

It was in this therapeutic environment at The Fortune Society that Plaintiffs met and came to care for each other; they encouraged each other as each faced the challenges of reentering society as a person with a felony conviction, in particular for a sex offense, with all of the attendant restrictions and stigma. (MM Decl. ¶ 16; YM Decl. ¶ 17.) Around July 2015, Mr. and Mrs. Marquez decided that they wanted to pursue a serious relationship. (MM Decl. ¶ 18; YM Decl. ¶ 19.) Because DOCCS requires individuals on supervised release for a sex offense to notify their parole officers of romantic relationships, Plaintiffs informed their respective parole officers of Plaintiffs' wish to associate with one another. (*Id*.; Compl. ¶ 68.)

Shortly thereafter and without explanation, Defendants in DOCCS's Division of Parole ("DOP") in Manhattan ordered Mr. Marquez not to have any contact with Mrs. Marquez. (Compl. ¶ 70; YM Decl. ¶¶ 19-21; TMT Decl., Exh. C at 2.) Similarly, Defendants in the Queens parole office ordered Mrs. Marquez to stay away from Mr. Marquez. (MM Decl. ¶¶ 19-22; TMT Decl., Exh. D1 at 15.) These prohibitions became a "special condition" added to the list of restrictions that Mr. and Mrs. Marquez, respectively, were required to abide by for the duration of their PRS terms. (*See, e.g.*, TMT Decl., Exhs. D1 at 15 & G2 at 3, 4.)

Mr. and Mrs. Marquez were extremely disappointed. Neither wanted to risk losing the other, and they therefore decided to consummate their relationship by marrying on September

16, 2015. (MM Decl. ¶ 23; YM Decl. ¶ 23; TMT Decl., Exh. D3 at 12.) With hopes that evidence of a legal union would convince their parole officers of the seriousness of their commitment to one another, Plaintiffs in January 2016 informed their respective parole officers of the marriage. (MM Decl. ¶ 24; YM Decl. ¶ 25.) Thereafter, DOCCS arrested them both. Mr. and Mrs. Marquez were charged with violating their respective special conditions, by virtue of marrying each other, and with violating Rule 7, a general rule that applies to everyone on PRS and which prohibits them from fraternizing with any person with a criminal record without parole officer approval. (TMT Decl., Exhs. D); *see also Reporting Conditions*, New York State Community Supervision Handbook (*available at* https://doccs.ny.gov/community-supervision-handbook/community-supervision) (last visited Mar. 2, 2020); 9 N.Y.C.R.R. § 8003.2(g).

***Mr. Marquez Is Sent to Prison for Marrying Mrs. Marquez***

At an administrative hearing on April 20, 2016, Mr. Marquez was assessed 12 months in prison for violating Rule 7 and the special condition. (Compl. ¶ 85; Declaration of Armando Lopez dated June 14, 2019 (“Lopez Decl.”), ECF No. 25, ¶ 4.) At her hearing on April 21, 2016, Mrs. Marquez was also found to have violated Rule 7 and her special condition, but was released back to community supervision, with both rules still in place. (Compl. ¶ 86; Declaration of Joan Brown dated August 9, 2019 (“Brown Decl.”), ECF No. 24, ¶ 5.) Afterwards, Mrs. Marquez’s attorney at the time, Joan Brown, wrote a letter to Defendant Senior Parole Officer Kevin Uzzell and Parole Officer Fuller requesting that DOCCS rescind Rule 7 and the special condition from her client’s conditions of PRS. (Brown Decl. ¶ 6; TMT Decl., Exh. E.) Ms. Brown argued that prohibiting Mrs. Marquez from having contact with her husband was arbitrary and capricious and violated her constitutional right to associate with her family. (*Id*.)

In response, on or about July 29, 2016, Defendant Mark Parker, a bureau chief in DOCCS’s Queens parole office, called Ms. Brown and informed her that he did not have an issue

with Mrs. Marquez seeing Mr. Marquez, but that Defendant Parker could not permit Mrs. Marquez to contact Mr. Marquez if Officers in DOCCS's Manhattan office were prohibiting Mr. Marquez from seeing his wife. (Brown Decl. ¶ 7.)

***Mr. Marquez Is Not Allowed to Associate with His Wife Even After Serving His Additional Term of Incarceration***

While Mr. Marquez was incarcerated for violating the no-contact conditions of his PRS, his counsel at that time, Armando Lopez, tried repeatedly to ascertain whether Mr. Marquez would be allowed to be with his wife upon the completion of his 12-month prison penalty. (Lopez Decl. ¶¶ 5-8.) Receiving no response, Mr. Lopez wrote a letter in January 2017 arguing that if Manhattan DOP were to issue a no-contact provision such as the one previously imposed on Mr. Marquez, it would constitute a violation of his fundamental rights under the U.S. Constitution. (*Id.* ¶ 6; TMT Decl., Exh. F at 1-6.) Mr. Lopez finally made contact with Defendants in February 2017. However, Defendant Medina informed Mr. Lopez that the matter had been sent up the chain of command; neither Mr. Lopez nor Mr. Marquez were ever informed of what action Defendants planned to take upon his release. (Lopez Decl. ¶ 8; YM Decl. ¶¶ 28-41.) Indeed, Mr. Marquez only found out the day he was released.

In March 2017, when Mr. Marquez was released from prison to a Bronx homeless shelter that serves individuals with mental illness, a parole officer handed him a list of conditions that included a special condition requiring Mr. Marquez to stay away from Mrs. Marquez. (Compl. ¶ 99; TMT Decl., Exh. G2 at 2; YM Decl. ¶ 41.) The officer did not explain to Mr. Marquez why the condition was being imposed. (YM Decl. ¶ 41.)[2] Upon reporting to DOCCS's Manhattan parole office on the following day, Mr. Marquez was also required to sign a special condition of PRS indicating he would have no contact with his wife. (YM Decl. ¶ 42; TMT

[2] Thus began the set of violations of the Marquezes' constitutional rights at issue in this litigation.

Decl., Exh. G2 at 3.) Defendants again failed to explain to Mr. Marquez why the condition was being imposed.

***Mr. Marquez's Post-Release Supervision Is Transferred and The No-Contact Restriction Is Temporarily Removed***

In mid-August 2017, DOCCS transferred Mr. Marquez's PRS to the DOP's Bronx office. (YM Decl. ¶ 44.) In Mr. Marquez's first meeting with his new parole officer, Defendant McEwan, she handed Mr. Marquez a copy of his PRS conditions. (*Id.* ¶ 45; TMT Decl., Exh. G3.[3]) They no longer included the special condition. Mr. Marquez asked if he could see his wife, and Officer McEwan indicated that she did not foresee any issues with Mr. Marquez doing so. (YM Decl. ¶ 46.) Plaintiffs were elated; based on Mrs. Marquez's and Ms. Brown's prior discussions with Defendant Parker and others, Plaintiffs believed that the only thing that had been keeping them from being together was the refusal of those supervising Mr. Marquez to allow contact. (MM Decl. ¶¶ 32-33; YM Decl. ¶ 47; Brown Decl. ¶ 7.)

On August 27, 2017, the couple celebrated Mr. Marquez's 31st birthday together. (YM Decl. ¶ 48.) It was the first time they were able to freely associate since he went to prison for violating Rule 7 and the special condition. (MM Decl. ¶¶ 33-34; YM Decl. ¶ 48.) Soon after, the happy couple began looking for a place to live together. With two incomes from their respective jobs, the couple believed they would be able to rent a modest apartment and finally begin building a life together. They spent many hours contacting landlords and visiting listings online and in person. (MM Decl. ¶¶ 35-38; YM Decl. ¶¶ 49-51.)

During this time, Mrs. Marquez repeatedly spoke with her then-parole officer, Aiesha Quick. (MM Decl. ¶ 39.) Whenever Mrs. Marquez spoke to Quick about the apartment search

[3] As indicated in the Complaint, Plaintiffs do not have a copy of that set of conditions; nevertheless, a later copy reflects the same information—the absence of the special condition.

with her husband, Quick, in comparison to all other DOCCS personnel, was encouraging. (*Id.*) In fact, at almost every one of their bi-weekly parole visits, Quick asked Mrs. Marquez about how the apartment hunt was progressing and how Mr. Marquez was doing. (*Id.*) At no point during this period did Quick indicate to Mrs. Marquez that she was not to have contact with Mr. Marquez. (*Id.*)

***The Restrictions Are Reinstated Without Explanation***

The couple's plans to establish a life together fell apart in late November 2017. At that time, Mr. Marquez, still supervised by the same Bronx parole office, was assigned to a new parole officer, Defendant Lofton. (YM Decl. ¶ 52.)[4] At their initial meeting, Defendant Lofton acknowledged that Mr. Marquez was no longer subject to the special condition prohibiting him from having contact with his wife. (*Id.*) However, Lofton said he was contemplating whether to ban contact under Rule 7, the general condition of parole prohibiting fraternization with individuals with criminal records without prior authorization. (*Id.* ¶ 53.)

On or around November 30, 2017, Mr. Marquez was informed by Defendant Lofton that he would be exercising his discretion to interpret Rule 7 to apply to Mr. Marquez's relationship with Mrs. Marquez—effectively reinstating the no-contact condition. (*Id.* ¶¶ 52-53.)

***Clarification on the Need for the Restrictions Is Sought***

Around November 30, 2017, counsel for Mr. and Mrs. Marquez contacted Danielle May, an assistant counsel for DOCCS. (TMT Decl. ¶ 10.) Counsel informed Ms. May that Mr. Marquez had been prohibited from seeing his wife, and that Mrs. Marquez's parole officers in Queens, meanwhile, did not appear to have a problem with her seeing Mr. Marquez. (*Id.*) Ms. May responded that she would reach out to Plaintiffs' parole officers in the Bronx and in

---

[4] After attempting to serve Defendant Lofton, Plaintiffs' counsel learned that his name may be spelled as "Loftin." However, this has not been confirmed. After three unsuccessful attempts at personal service, this defendant was served by mail at the address provided by the Assistant Attorney General representing Defendants.

Queens to determine why there seemed to be a discrepancy in how the two parole offices were exercising their discretion regarding the couple's ability to see each other. (*Id.*) Ms. May further stated that the offices needed to communicate the reason for these decisions, and, regarding Mr. Marquez, "clearly articulate" what he must do to work towards being able to see his wife. (*Id.*)

On January 18, 2018, Ms. May informed counsel that she had spoken with Defendant Lofton, who conveyed that Mr. Marquez was banned from contact with his wife based on "the nature and severity of both of their crimes." (*Id.*) Ms. May further informed counsel that while she had not been able to speak to Mrs. Marquez's parole officers in Queens, according to a computer check by Defendant Lofton, Mrs. Marquez appeared to be subject to a special condition, effective August 2015, that she have no contact with Mr. Marquez. (*Id.*) Ms. May stated that Defendant Lofton, along with his "bureau chief," Defendant John Roe, planned to speak with Mrs. Marquez's parole officer. (*Id.*)

Thereafter, in January 2018, Defendant Lofton contacted Quick in Queens and inquired if she was aware that Mrs. Marquez had been having contact with her husband. (MM Decl. ¶ 43.) Quick responded in the affirmative and filled in Mrs. Marquez—who happened to be in the office at the time, meeting with Quick for their bi-weekly check-in—on the conversation. (*Id.*)

***DOCCS Increases Scrutiny Rather than Relaxing or Tailoring the Restrictions***

Not long after, Mrs. Marquez received a phone call from Quick. (MM Decl. ¶ 43.) Quick told Mrs. Marquez that she was no longer allowed to see her husband, and explained that Quick's supervisor required Mrs. Marquez to stay away from Mr. Marquez. (*Id.*) While Quick indicated she did not understand the change in position, Quick nonetheless conveyed and

enforced the message from her superiors. (*Id*.) Soon after, on January 26, 2018, Defendant Lofton put a GPS device on Mr. Marquez to monitor his whereabouts. (YM Decl. ¶ 56.)

On January 25, 2018, Plaintiffs' counsel spoke with Ms. May. (TMT Decl. ¶ 10.) Ms. May conveyed that Defendant Lofton had explained that Mr. and Mrs. Marquez were both "high level offenders" and thus "deserving of serious scrutiny." (*Id*.) In his view, as articulated by Ms. May, they had committed "the same offense in terms of category of offense," and that "just like you wouldn't have two robbers living together, you wouldn't have two sex offenders living together," regardless of whether they were married or not. (*Id*.)

On or around January 29, 2018, Mrs. Marquez was assigned to a new parole officer, Defendant Lindsy Osouna. (MM Decl. ¶ 44.) Officer Osouna, accompanied by Defendant Neeley, a senior parole officer in the Queens office, ordered Mrs. Marquez to stay away from Mr. Marquez. (*Id*.) Defendants further instructed Mrs. Marquez to sign a written document memorializing the special condition, which contained language to this effect. (*Id*.; TMT Decl., Exh. H at 3.) Furthermore, on February 2, 2018, Quick placed a GPS monitor on Mrs. Marquez to monitor her whereabouts. (MM Decl. ¶ 46.)

***Plaintiffs Fear They Will Never Be Permitted to Exercise Their Fundamental Rights***

Plaintiffs are distraught, fearful, and anxious as a result of Defendants' arbitrary restriction and the manner in which they have imposed the no-contact condition. Despite repeated requests for clarification on what justifies the ongoing restriction, and for consideration of their right to associate as married people since Mr. Marquez's release from prison in March 2017, Defendants have provided no answers. In fact, in 2019, Defendant Osouna told Mrs. Marquez that it might "lighten the situation" regarding her ankle bracelet if she divorced Mr. Marquez. (MM Decl. ¶ 50.) As a result, the Marquezes are struggling, emotionally and

financially. Indeed, Mrs. Marquez's mother recently died, her second job is on hold due to the COVID crisis, and her own housing instability looms large if she and Mr. Marquez cannot cohabit. (*Id.* ¶¶ 55-60.) Yet, Plaintiffs have seen that Defendants have no plan for allowing their union to flourish; they would rather thwart it than allow the Marquezes to build a life together.

## III. ARGUMENT

By barring Yancy and Maritza Marquez from having contact with each other, Defendants have prevented Plaintiffs from exercising a fundamental constitutional right—their freedom to marry and to live together as a family—a right "older than the Bill of Rights, older than our political parties, older than our school system." *Zablocki v. Redhail*, 434 U.S. 374, 383-84 (1978); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984) ("choices to enter into and maintain certain intimate human relationships . . . receive[] protection as a fundamental element of personal liberty"). Specifically, Defendants have burdened Plaintiffs' fundamental liberties through the special "no contact" conditions, and the standard "anti-fraternization" conditions, reducing their relationship to a 'paper marriage' only.

Critically, Defendants have failed to identify any interest served by separating Plaintiffs. *See Doe v. Cappiello*, 758 F. App'x 181, 184 (2d Cir. 2019) (where defendants "imposed a complete ban on contact" that infringed on fundamental liberty interests "without considering less-restrictive alternatives," constitutional violation was clear and qualified immunity unavailable). The restriction is not based on any potentially permissible rationale; rather, Plaintiffs have been denied the right to live as a married couple simply because they each have a conviction for a sex offense.

Accordingly, Mr. and Mrs. Marquez have established their entitlement to injunctive relief, which requires a showing (1) of likelihood of irreparable harm in the absence of preliminary relief, (2) of likelihood of success on the merits, (3) that the balance of equities tip in

plaintiffs' favor, and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013). *See also Nken v. Holder*, 556 U.S. 418, 435 (2009) (third and fourth factors "merge when the Government is the opposing party").

### A. Plaintiffs Will Continue To Suffer Irreparable Injury Absent A Preliminary Injunction

The liberty interest at issue—freedom to marry and live together as husband and wife—is a basic right guaranteed in the Constitution. *Loving v. Virginia*, 388 U.S. 1, 12 (1967) ("Marriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival.") (citation omitted). The denial of the right, even for a short period of time, constitutes irreparable injury. *See Elrod v. Burns*, 427 U.S. 347, 373-74 (1976); *Conn. Dep't of Envtl. Prot. v. Occupational Safety & Health Admin.*, 356 F.3d 226, 231 (2d Cir. 2004). Each day Defendants impose the no-contact restriction, Mr. and Mrs. Marquez are deprived of their right to intimate association and subjected to conditions that threaten to destroy their marriage entirely. Because Mr. and Mrs. Marquez's terms of PRS continue until the years 2022 and 2034, respectively, much is at stake. By the time both conditions are lifted, Mr. Marquez will be 48 years old and Mrs. Marquez will be 45.

The magnitude of the deprivation cannot be overstated. Defendants' actions not only deny Plaintiffs "the hope of companionship" that marriage entails, *Obergefell v. Hodges*, 135 S. Ct. 2584, 2600 (2015), but also rob them of well-recognized tools to assist in their reintegration to society and the "and assurance that while both still live there will be someone to care for the other." *Id.*; *see, e.g.*, Robbe, Mann, Maruna & Thornton, *An Exploration of Protective Factors Supporting Desistance From Sexual Offending*, 27 Sexual Abuse Journal 16, 22 (2015) ("respectful and age appropriate sexual relationships" serve as a protective factor reducing the

risk of sexual recidivism); Mark T. Berg & Beth M. Huebner, *Reentry and the Ties that Bind: An Examination of Social Ties, Employment, and Recidivism*, 28 Justice Quarterly 382, 383 (2011) (summarizing empirical research showing family support to be one of the most important factors in reducing recidivism). If their forced separation continues, their distress may manifest as hopelessness, destroying the progress they have made.[5]

In sum, Defendants' actions are irreparably harming each Plaintiff. This harm is "not remote or speculative but actual and imminent," and cannot be made whole with monetary compensation. *Tom Doherty Assoc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). *See also Tremper v. Ulster County Dep't of Probation*, 160 F. Supp. 2d 352, 356-37 (N.D.N.Y. 2001) (granting preliminary injunction because parole condition prohibiting "plaintiffs from living together as a family will cause injury that cannot be compensated by a damage award").

### B. There Is A Clear And Substantial Likelihood That Plaintiffs Will Prevail On The Merits

Plaintiffs will establish at trial, and have already established on the basis of the evidence submitted in conjunction with this motion, that the regulations promulgated by Defendants, and the conditions of PRS placed on Plaintiffs, impermissibly restrict their fundamental associational rights such that they are—at minimum[6]—entitled to declaratory and injunctive relief.

---

[5] Indeed, Mr. Marquez, whose mental health is more sensitive than Mrs. Marquez's, has exhibited signs that Defendants' actions are eroding the gains made during his initial period of reintegration with the community. (YM Decl. at ¶¶ 15, 62, 80-81.)

[6] DOCCS's abject failure to consider narrowly tailored alternatives means individual defendants involved in the blanket prohibitions placed on Plaintiffs will not be entitled to qualified immunity. *See Doe v. Lima*, 270 F. Supp. 3d 684, 711 (S.D.N.Y. 2017) (largely rejecting qualified immunity because "even assuming the facts justified some restrictions on contact between [the plaintiff and his son]—such as supervised visitation—or made such restrictions within the protection of qualified immunity, the parole officials here imposed a blanket restriction and admittedly made no attempt to tailor the restriction to [plaintiff's] circumstances"), *aff'd sub. nom*, *Doe v. Cappiello*, 758 F. App'x 181, 185 (2d Cir. 2019) (DOCCS not entitled to qualified immunity on substantive and procedural due process violations).

Nevertheless, for the purposes of this motion, issues relating to damages—and the corresponding qualified immunity analysis—are irrelevant to whether Plaintiffs' constitutional rights are presently being

**i. Plaintiffs Have a Fundamental, Constitutional Right to Marry and to Live Together as a Family**

The "sanctity of the family" is a fundamental element of personal liberty. *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977); *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) ("Choices about marriage, family life, and the upbringing of children are among associational rights this Court has ranked as 'of basic importance in our society' . . ."); *Lyng v. Castillo*, 477 U.S. 635, 639 (1986) (state interference with family living arrangements burdens a fundamental right). "Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred." *Obergefell*, 135 S. Ct. at 2599. So sacred is the right that even incarcerated prisoners, who are subject to substantial restrictions, may not be summarily denied that right. *Turner v. Safley*, 482 U.S. 78, 95-99 (1987) (striking down Missouri regulation prohibiting inmates from marrying other inmates or civilians unless prison superintendent finds "compelling reasons" for marriage).[7]

The Due Process Clause of the Fourteenth Amendment is the source of these fundamental rights, *see Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639-40 (1974), which are protected both substantively and procedurally. *See Smith v. Org. of Foster Families For Equality & Reform*, 431 U.S. 816, 842 (1977). Thus, where state action infringes on these rights, a court's

---

violated by DOCCS and whether the imposition of an injunction is necessary to avoid any further harm. *See Askins v. Doe No. 1*, 727 F.3d 248, 254 (2d Cir. 2013) ("Qualified immunity is a defense available only to individuals sued in their individual capacity" for damages); *Robinson v. New York*, 486 F. App'x 905, 907 (2d Cir. 2012) ("it does not bar declaratory or injunctive relief"); *see also African Trade & Info. Ctr., Inc. v. Abromaitis*, 294 F.3d 355, 360 (2d Cir. 2002) ("qualified immunity is not a defense" to claims for injunctive relief); *Project Release v. Prevost*, 463 F. Supp. 1033, 1037 (E.D.N.Y. 1978) ("th[e] doctrine is inapplicable in a suit for declaratory or injunctive relief").

[7] New York's regulation on inmate marriage appears to contravene the Supreme Court's holding in *Turner*. In New York, inmates are prohibited from marrying other inmates. 7 N.Y. C.R.R. 711.2(a)(4) ("When two persons are both confined in New York State correctional facilities, they will not be permitted to marry until at least one of them has been released from such confinement."); DOCCS Directive 4201, *Marriages During Confinement* (March 15, 2012) at II.D (same); *c.f. Langone v. Coughlin*, 712 F. Supp. 1061, 1069 (N.D.N.Y. 1989) ("Directive 4201 (9/14/79) cannot pass constitutional muster insofar as [it] prohibit[s] inmates serving life sentences from marrying").

analysis should focus on whether the action constitutes a substantive due process violation, *see, e.g.*, *Meyer v. Nebraska*, 262 U.S. 390 (1923) (state legislation violated substantive due process), and whether the deprivation of the rights, if allowable, was effected with adequate process pursuant to the burden-shifting framework set forth by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See, e.g.*, *Smith*, 431 U.S. 816 (procedure must be constitutionally adequate prior to deprivation of presumed familial right at issue); *Goldberg v. Kelly,* 397 U.S. 254 (1970) (pre-deprivation hearing required).

Because of the nature of the right at stake, courts apply "the most exigent level of inquiry[—]strict scrutiny," when reviewing a state's decision to restrict one's contact with a spouse or other family member. *Chi Iota Colony of Alpha Epsilon Pi Fraternity v. City Univ. of New York*, 502 F.3d 136, 143 (2d Cir. 2007). Applying this heightened standard, courts in this District and across the country have struck down state interference with various familial relationships. *See*, *e.g.*, *Doe v. Lima*, 270 F. Supp. 3d 684, 702 (S.D.N.Y. 2017) (condition barring plaintiff father, on PRS for a sex offense, from having contact with infant son infringed upon his rights), *aff'd*, *Doe v. Cappiello*, 758 F. App'x 181, 184 (2d Cir. 2019) ("any restrictions on a releasee's right to maintain a relationship with their child must satisfy strict scrutiny"); *United States v. Reeves*, 591 F.3d 77, 82-83 (2d Cir. 2010) (condition requiring plaintiff, convicted of a sex offense, to notify any potential partner of conviction "not narrowly tailored"); *United States v. Myers*, 426 F.3d 117, 125 (2d Cir. 2005) (Sotomayor, J.) (condition of release restricting convicted sex offender's contact with his own child "implicat[ed] a fundamental liberty interest protected by due process"); *see also United States v. Hobbs*, 845 F.3d 365, 369 (8th Cir. 2016) (release condition restricting contact with co-defendant spouse failed to consider "more narrowly tailored alternatives"); *United States v. Napulou,* 593 F.3d 1041, 1047-48 (9th

Cir. 2010) (vacating condition banning contact with life partner who also had felony conviction); *United States v. Smith*, 606 F.3d 1270, 1283-84 (10th Cir. 2010) (condition restricting plaintiff, convicted of a sex offense, from associating with minors, including his own children, required a "compelling government interest"); *United States v. Voelker*, 489 F.3d 139 (3d Cir. 2007) (same).[8]

The burdens imposed by Defendants directly impact Plaintiffs' ability to continue their marriage and to associate as husband and wife. Under strict scrutiny review, a condition of PRS that limits—or here, completely bans—a person's contact with a spouse is "'reasonably necessary' only if the deprivation is narrowly tailored to serve a compelling government interest.'" *Myers*, 426 F.3d at 126 (citing *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). Defendants flatly fail to meet this strict standard.[9] But moreover, because Defendants have never offered any justification other than Plaintiffs' status as sex offenders, the restrictions placed on Plaintiffs' fundamental liberties fail even under a rational basis test.

#### ii. The State's Proffered Reason for Breaking Apart Plaintiffs' Marriage Has Been Rejected by Other Courts as Insufficient

Defendants have offered no evidence that Plaintiffs living together as husband and wife would interfere with their rehabilitative process. The purported justification for the no-contact

---

[8] Although a circuit split exists on the level of scrutiny applied to conditions of federal supervised release implicating a fundamental liberty interest, the test in this Circuit is: "if any condition of supervised release infringes on a constitutionally protected right, it must be reviewed under strict scrutiny—just as any other government action that infringes on a fundamental right must be." Max B. Bernstein, *Supervised Release, Sex-Offender Treatment Programs, and Substantive Due Process*, 85 FORDHAM L. REV. 261, 284-86 (2016) (citing *United States v. Myers*, 426 F.3d 117, 125-26 (2d Cir. 2005)).

[9] Over forty years ago, the Supreme Court invalidated an arbitrary and paternalistic Wisconsin law that similarly restricted the fundamental rights of that state's citizens. *See Zablocki v. Redhail*, 434 U.S. 374 (1978). Even assuming the state had an interest in ensuring that "persons with support obligations to children from prior marriages [were] counseled before they entered into new marital relationships and incurred further support obligations," that interest could not support "the withholding of court permission to marry once counseling [was] completed." *Id.* at 388. Thus, because the "means selected by the State for achieving these interests unnecessarily impinge[d] on" the citizens' fundamental liberties, the statute failed a heightened scrutiny review. *Id.*

condition is merely that two people with convictions for sex offenses should not be together. (Compl. at ¶ 122; TMT Decl. ¶ 10.) But courts have already rejected such reliance on "Plaintiffs' status as sex offenders" as insufficient to deny "their right to live with extended family—a right enshrined as fundamental by the Supreme Court in *City of East Cleveland*." *Doe #1 v. Marshall*, No. 15 Civ. 606 (WKW), 2018 WL 1321034, at *7 (M.D. Ala. Mar. 14, 2018). There is no "'except-for-sex-offenders' rule" to the fundamental right to intimate association. *Id.*

In *Tremper v. Ulster County Department of Probation*, for example, a sister court in the Northern District of New York assessed the constitutionality of a condition prohibiting Plaintiff Julie Tremper, on probation for gun possession, from associating with Plaintiff DaShawn Johnson, with whom Tremper had a child and shared a home but was not married. 160 F. Supp. 2d at 355. Defendants argued that the restriction was "rationally and reasonably related to the goal of rehabilitation," which would be hampered by Tremper's association with Johnson, who was also on probation, and had an extensive criminal record including a pending menacing charge. *Id.* at 359. In granting Plaintiffs' motion for a preliminary injunction, the court noted that the condition interfered with family living arrangements, thus burdening a fundamental right. *Id*. While "the state has a legitimate interest in promoting the rehabilitation of probationers," the Defendants' "association-leads-to-criminality theory" was "insufficient to justify impeding a constitutional right." *Id.*

Similarly, in *United States v. Napulou*, the Ninth Circuit addressed a release condition that prohibited Cherlyn Napalou, convicted of drug distribution, from having contact with her life partner, Karla Kahau, who also had a felony conviction. 593 F.3d 1041, 1046 (9th Cir. 2010). The district court had concluded that the restriction was warranted because "Kahau [was] 'a good manipulator,'" and had previously been involved in a relationship that had "devolved

into violence." *Id.* On appeal, the circuit court vacated the condition on the basis that there was insufficient evidence to justify the severe intrusion on Napalou's fundamental right to intimate association. *Id.* at 1047-48. The circuit court reasoned:

> [I]t appears that Napulou and Kahau's relationship is not founded on criminality but rather involves productive behavior such as attending counseling sessions and finding a job. Napulou has stated that Kahau has been a "very big support" in her life, and that she would be devastated if she could not continue to see her. If there is a reason for interfering with Napulou and Kahau's relationship that justifies the special condition prohibiting them from contacting one another, regardless of the nature of the contact and of their progress in achieving rehabilitative goals, the government must introduce the appropriate evidence that would warrant the imposition of such a condition.

*Id.*

Here, as in *Tremper* and *Napalou*, Defendants have offered no evidence that Mr. Marquez would interfere with Mrs. Marquez's rehabilitation, or vice versa. Their sex offenses were unrelated (in fact, they did not even meet until after they had served their prison terms and were in rehabilitative programs at The Fortune Society), and represented the first and only criminal conviction for both. And here, as in *Napalou*, all indications are that Plaintiffs benefited from the mutual support they offered one another. Indeed, some of Mr. Marquez's greatest rehabilitative accomplishments—including the completion of job training and gainful employment—were achieved with Mrs. Marquez's assistance and encouragement, when the two were able to communicate.

Furthermore, there has been no evidence of either individual exerting any negative influence over the other. Nor has their relationship triggered any criminal conduct. When Mr. Marquez went back to prison for marrying Mrs. Marquez, she sought permission from her parole officers before calling, writing, or sending money to her husband in prison. (*See* MM Decl. ¶ 30.) When she was told that she should not visit him in prison and to be patient while he

served his one-year term, she complied. (*Id*.); *cf. People v. Howland*, 145 A.D.2d 866 (3d Dep't 1988) (condition barring wife from living with husband upheld where her criminal activity began with her association with him, and his criminal influence over her was apparent from her attempt to smuggle prison contraband to him). In sum, Defendants' proffered reason for turning Plaintiffs' marriage into a paper union has repeatedly been rejected as insufficient, and must be rejected here as well.

**iii. The State's Theoretical Justifications for Separating Plaintiffs Are Likewise Insufficient**

To be sure, courts have upheld restrictions on intimate association where the government put forth specific, demonstrable evidence that a supervisee may harm the person with whom the individual wished to associate. *See Bostic v. Jackson*, No. 04 Civ. 676 (NAM), 2008 WL 1882696, at *5 (N.D.N.Y. Apr. 24, 2008) (restriction on plaintiff-parolee's contact with his wife and her daughter, "until plaintiff could show that his behavior could be trusted," was reasonable where wife had been a victim of his abuse, and his conviction was for violating order of protection and burglarizing wife's home); *Williams v. New York State Div. of Parole*, 71 A.D.3d 524, 526 (1st Dep't 2010) (upholding no-contact condition imposed on parolee with "extensive history of violence against women" and orders of protection for harassing his wife). However, here, neither Mr. nor Mrs. Marquez has any history of domestic violence, either with each other or with anyone else. Their situation is thus quite distinct from the cases above.

Other potential justifications, which have never been articulated to Plaintiffs by Defendants, include concerns that sex offenders might relapse in their treatment because of their association with other sex offenders, or that they might somehow work together to target potential victims. (*See* TMT Decl. ¶ 10 (DOCCS counsel conveying Defendants' belief that restriction was justified because Plaintiffs had committed "the same offense in terms of category

of offense”).) These reasons, however, are also inapplicable. With regard to their respective victims, Plaintiffs’ offenses could not be more different. Whereas Mr. Marquez’s conviction involved sexual conduct against his minor male cousin, Mrs. Marquez was convicted of engaging in sexual conduct with an elderly woman. Thus, any assertion that Plaintiffs must be kept apart because of the “similar” nature of their past offenses amounts to an argument that mere association leads to criminality, a justification which has already been rejected as “insufficient to justify impeding a constitutional right.” *Tremper*, 160 F. Supp. 2d at 358.

Moreover, any post-hoc justification based on impediment to rehabilitation must also be rejected because Defendants have not put forth any evidence that Mr. and Mrs. Marquez would hinder each other’s reentry and reintegration into society. To the contrary, as Mr. and Mrs. Marquez worked to gain insight into their behavior and reestablish themselves in society, they have encouraged each other and provided mutual support for one another. Just as in *Napulou*, once they found that support, they were “going to hold on to that,” which is why they married. *Napulou*, 593 F.3d at 1044.

This makes sense. A wealth of empirical research has established that generally, marriage and familial support decrease the risk of recidivism. *See, e.g.*, R. Sampson *et al.*, *Does Marriage Reduce Crime? A Counterfactual Approach To Within-Individual Causal Effects*, CRIMINOLOGY, Vol. 44 No. 3 (2006) (“being married is associated with a significant reduction in the probability of crime, averaging approximately 35 percent”);[10] *Williams*, 71 A.D.3d at 527 (Manzanet-Daniels, J., dissenting) (recognizing “the special value of the marital relationship, to parolees like anyone else, as a source of emotional support and well-being”); *Reeves*, 591 F.3d at 82-83 (condition requiring defendant to notify any potential intimate partner of his sex offense

[10] *Available at* https://scholar.harvard.edu/files/sampson/files/2006_criminology_laubwimer_1.pdf.

conviction put defendant at "risk of social isolation and thus impair[ed], rather than enhance[d], his rehabilitation"). Looking specifically at Mr. and Mrs. Marquez's relationship, these general conclusions are supported with specific facts from their rehabilitative processes and from their struggles to create a supportive and stable living environment. Indeed, Mr. Marquez was doing his best when he and his wife were working towards building a future together. (YM Decl. ¶¶ 44-49; MM Decl. ¶¶ 35-38.) And without his support, emotionally and financially, Mrs. Marquez is concerned that she will not be able to carry on—particularly during this harsh, economic crisis brought on by the COVID lockdown. (MM Decl. ¶¶ 55-64.)

Additionally, Dr. Singer, who individually evaluated both Mr. and Mrs. Marquez, has concluded that their relationship is only a positive factor for their rehabilitation. (TMT Decl., Exh. I at 2-3, 14.) Indeed, in Dr. Singer's opinion, Defendants' decisions to interfere in this supportive relationship is manifesting itself by damaging Mr. Marquez's mental health and pushing him towards relapse regarding his substance abuse issues. (*Id.* at 14; YM Decl. ¶¶ 15, 62, 80-81.) Given the absence of *any* reasoning and evaluation by Defendants, Plaintiffs need not defend themselves in a vacuum; nevertheless, Dr. Singer's independent confirmation that the course of action Defendants' have engaged in is wholly-detrimental and counter to established principles of rehabilitation is telling.

#### iv. Blanket Elimination of Plaintiffs' Fundamental Rights—Without Any Procedural Protection—Fails to Advance the State's Interests and Is Not Narrowly Tailored

Whatever Defendants' justification for the denial of Plaintiffs' fundamental rights, the challenged restrictions cannot withstand constitutional muster for the additional reason that Defendants have made no attempt to tailor the restrictions to limit their impact on Plaintiffs' familial association. From almost the moment Plaintiffs informed their parole officers of their desire to be together, Defendants imposed an absolute ban on contact. There is no evidence that

Defendants ever considered less restrictive means, such as supervised visits, that would provide a gradual path to eventual cohabitation. Defendants have never articulated to Plaintiffs what they could do to work toward having the restrictions eased or lifted. Indeed, because Defendants' only justification for the restrictions is Plaintiffs' status as convicted sex offenders, there is nothing Plaintiffs can do to prompt Defendants to reconsider. In effect, New York, through DOCCS, has determined that there is a categorical exception to one's fundamental right to marry and associate. Thus, not only have Defendants failed to provide a process by which Plaintiffs might defend their fundamental rights, those rights have been summarily extinguished without justification or regard to the negative effects to which Plaintiffs were subjected.

Recently, another court in this District addressed the associational rights of a sex offender on PRS. That case, *Doe v. Lima*, involved a special condition of parole imposed by DOCCS categorically barring the plaintiff-father from having contact with his infant son. 270 F. Supp. 3d 684, 689 (S.D.N.Y. 2017). The *Lima* court first determined, consistent with then-Circuit Judge Sotomayor's decision in *Myers*, that strict scrutiny applied "to restrictions on liberty incident to post-prison supervisory regimes, whether denominated as parole (as in New York State) or as supervised release (as in the federal system)." *Id.* at 702. The court then held that the ban at issue was "neither factually justified nor narrowly tailored at all"; rather, the "deprivations of plaintiffs' fundamental liberty interests were sufficiently arbitrary and egregious to violate substantive due process." *Id.* at 704. Of note, the court stated that "[n]o concerted attention was given to whether restrictions on contact…, let alone a wholesale ban, were justified." *Id.* at 705.

The Second Circuit affirmed the *Lima* court's denial of qualified immunity on the same basis: the "complete ban" imposed by DOCCS, "without considering less-restrictive

alternatives," was conclusive on the question of whether the state met its "obligation to narrowly tailor"—it had not. *Doe v. Cappiello*, 758 F. App'x 181, 184-85 (2d Cir. 2019).

Here, too, there is no evidence Defendants considered any less restrictive alternatives to the wholesale ban on all contact between Mr. and Mrs. Marquez. The blanket prohibition was certainly not justified or tailored at all, and fail under any level of scrutiny. *See Hobbs*, 845 F.3d at 369 (condition restricting contact with co-defendant spouse invalid where no indication more narrowly-tailored alternatives were considered); *Reeves*, 591 F.3d at 83 (notification condition was "not narrowly tailored since it applie[d] to any significant romantic relationship"); *United States v. Chong*, 217 F. App'x 637, 638-39 (9th Cir. 2007) (despite defendant's history of violence against wife, and court finding that he posed "clear danger" to her, condition prohibiting all contact impermissibly allowed "the state [to] insert[] itself into [] marital relationship in an overly broad way"); *United States v. Roberts*, 2007 WL 2221416, at *11 (E.D. Pa. July 31, 2007) (complete prohibition on co-defendant couple from associating with each other failed any level of constitutional scrutiny; granting defendants' request for contact in person, by telephone, mail and email); *Dawson v. State*, 894 P.2d 672, 680–81 (Alaska Ct. App. 1995) (remanding for consideration of narrower alternatives, where no effort had been made to tailor probation condition restricting marital contact, because "precluding association between marital partners is [] obviously an extreme restriction of liberty, even when the marital partners were once partners in crime").

**C. A Preliminary Injunction Is In The Public Interest**

The balance of equities and the public interest also support preliminary relief where, as here, the moving party is likely to succeed on the merits of their constitutional challenge. That is because the "[g]overnment does not have an interest in the enforcement of an unconstitutional law." *New York Progress*, 733 F.3d at 488; *cf. Geiger v. Kitzhaber*, 994 F. Supp. 2d 1128, 1138

(D. Or. 2014) ("laws regulating marriage [and family life] must advance legitimate state interests, and not a mere desire to harm a particular class of its citizens").

There is a public interest in the protection of the fundamental right to marriage and intimate association. To be sure, Defendants have an interest in protecting the public from sexual re-offence and promoting rehabilitation. But in a situation such as this, where recidivism risk is decreased and rehabilitation supported by the protection of fundamental rights, Defendants have no valid interest in infringing on those rights. *See Reeves*, 591 F.3d at 82-83 (condition that put defendant at "risk of social isolation and thus impair[ed], rather than enhance[d], his rehabilitation" was invalid despite the compelling interest of "protecting a romantic partner's children"); *Nken v. Holder*, 556 U.S. 418, 420 (2009) (The balance of the equities and public interest factors "merge when the Government is the opposing party.").

## IV. CONCLUSION

Once Mr. Marquez was released from prison for his unauthorized marriage to, and "fraternization" with, Mrs. Marquez—Defendants had to fashion a reasoned approach to the couple's marriage and future interactions. But they failed to do so. As Plaintiffs will demonstrate at trial, and as already sufficiently demonstrated herein, Defendants have impermissibly infringed, and continue to infringe, on Mr. and Mrs. Marquez's fundamental rights. Therefore, this Court should issue a preliminary injunction that allows Plaintiffs to immediately exercise their intimate associational rights, which should never have been infringed in the first place and certainly not to this degree.

Dated: April 24, 2020

Respectfully submitted,

*Attorneys for Plaintiffs*
*Maritza Marquez and Yancy Marquez*

By: _/s/John D. Winter____

Tomoeh Murakami Tse
Will A. Page

THE LEGAL AID SOCIETY
CRIMINAL APPEALS BUREAU
199 Water Street, 5th Floor
New York, New York 10038
Tel: 212.577.3300
tmurakamitse@legal-aid.org
wpage@legal-aid.org

John D. Winter
Christina Seda-Acosta

PATTERSON BELKNAP
WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Tel: 212.336.2000
jwinter@pbwt.com
cseda@pbwt.com

**CERTIFICATE OF SERVICE**

I hereby certify that on April 24, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all counsel of record.

Dated: April 24, 2020

Tomoeh Murakami Tse
Will A. Page

THE LEGAL AID SOCIETY
CRIMINAL APPEALS BUREAU
199 Water Street, 5th Floor
New York, New York 10038
Tel: 212.577.3300
tmurakamitse@legal-aid.org
wpage@legal-aid.org

John D. Winter
Christina Seda-Acosta

PATTERSON BELKNAP
WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Tel: 212.336.2000
jwinter@pbwt.com
cseda@pbwt.com